UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BRENDAN CUNNEY,

                                        Plaintiff,

        -v-

BOARD OF TRUSTEES OF THE VILLAGE OF
GRAND VIEW, NEW YORK; ZONING BOARD
OF APPEALS FOR THE VILLAGE OF GRAND
VIEW, NEW YORK; ATZL, SCATASSA &
ZIGLER LAND SURVEYORS; JOHN R. ATZL,
Individually; and JOSEPH W. KNIZESKI, as
Building Inspector of the Village of Grand View-
on-Hudson,

                                        Defendants.

Case No. 08-CV-9507 (KMK)

OPINION AND ORDER

Appearances:

Dennis E. A. Lynch, Esq.
Feerick Lynch MacCartney, Esq.
South Nyack, NY
*Counsel for Plaintiff*

Mary Elizabeth Brady Marzolla, Esq.
MacCartney, MacCartney, Kerrigan & MacCartney
Nyack, NY
*Counsel for Plaintiff*

Lewis R. Silverman, Esq.
Jennifer H. Pymm, Esq.
Samantha Velez, Esq.
Rutherford & Christie, LLP
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        This is a case that demonstrates that law, like life, can be a game of inches.  Plaintiff

Brendan Cunney brought the instant Complaint against Defendants Board of Trustees of the

Village of Grand View, New York ("Board"); Zoning Board of Appeals for the Village of Grand

View, New York ("ZBA"); and Joseph Knizeski, in his official capacity as Building Inspector of

the Village of Grand View-on-Hudson ("Knizeski") (collectively, "Defendants" or "Village"),

alleging multiple claims arising out of Defendants' application of a height-restriction zoning

ordinance to Plaintiff's property.[1]  Before the Court is Defendants' Motion for Summary

Judgment.  For the following reasons, the Court grants Defendants' Motion in part and denies it

in part.

## I.  BACKGROUND

### A.  Factual Background

Gladstone Estates, LLC ("Gladstone") is a New York limited-liability company that

Plaintiff and his brother formed in mid-2005.  (*See* Pl.'s Resp. to Defs.' Local Rule 56.1

Statement ("Pl.'s 56.1 Statement") ¶¶ 1, 3 (Dkt. No. 69).)  On October 28, 2005, Gladstone,

which is not a party in this Action, took title to a piece of property within the Village of Grand

View-on-Hudson, NY.  (*See* Decl. in Support ("Defs.' Decl.") Ex. N, at unnumbered 2 (Dkt. No.

58) (unofficial copy of recorded deed).)  Since at least September 30, 2005, when Plaintiff

accepted a proposal from John Atzl ("Atzl"), made on behalf of Atzl, Scatassa & Zigler Land

Surveyors, P.C. ("ASZLS"), for "surveying and planning services," Plaintiff intended to develop

this piece of property for residential use.  (*See* Defs.' Decl. Ex. P (Atzl proposal, submitted on

August 29, 2005, and accepted by Plaintiff on September 30, 2005).)

Of the two "residential districts" within the Village, the subject property was located in

"Zone B," also known as "R-10."  (*See* Defs.' Decl. Ex. L, at unnumbered 3 (excerpt of the

---

[1] The Court has listed the Parties names as they appear on the docket.  For purposes of
clarity, the Court notes that "Village of Grand View, New York," and "Village of Grand View-
on-Hudson" refer to the same village.

village's zoning law); Defs.' Local Rule 56.1 Statement ("Defs.' 56.1 Statement") ¶ 16 (Dkt. No. 65).)  The requirements applicable to that zone are contained in Chapter IX of the Village of Grand View-on-Hudson Zoning Law ("Village Zoning Law").  (*See* Aff. in Opp'n ("Pl.'s Decl.") Ex. A ("Village Zoning Law") (Dkt. No. 67).)  At the time Gladstone took title to the property, and at all relevant times during this litigation, section E of that chapter ("section E") contained a restriction on the height of any building constructed within Zone B:

> It being the purpose of this section, among others, to preserve as nearly as practicable the remaining views [of] the Hudson River from River Road, no building shall be erected in Zone B . . . which shall rise more than two stories in height nor more than four and one-half . . . feet above the easterly side of River Road.  Where the lot lies substantially at the same level as River Road, no building or construction shall rise more than one story or fifteen feet in height.

(*Id.* at IX.E.)  Moreover, the Village Zoning Law separately defined "easterly side of River Road" to mean "the point at which the road surface of River Road intersects with the easterly curb adjacent to River Road," adding that the referenced "point of intersection is commonly referred to as the 'gutter.'"  (Defs.' Decl. Ex. L, at 4.)[2]

In addition to outlining the requirements applicable to houses constructed within Zone B, the Village Zoning Law also outlined the procedures a property owner had to follow in order to build, and then occupy, a house.  First, to commence construction, the owner had to obtain site-plan approval and a building permit.  (*See* Village Zoning Law, at XII.A.1, XIV.D.1(c)(1).)  To obtain the former, the owner had to submit an application to the Village's Planning Board ("Planning Board").  (*See id.* at XIV.D.1(c)(2).)  The Planning Board then had to hold a public hearing, after which it would approve or disapprove the application.  (*See id.* at XIV.D.1(c)(3)–(5).)  Having received site-plan approval, the owner, or "the agent, architect, landscape architect,

---

[2] The Court notes that while this exhibit is not consecutively paginated, page 4 refers to the page number marked as "4," rather than the fourth page of the exhibit.

engineer or builder employed in connection with the proposed work," had to submit an application for a building permit to the Village's Building Inspector—who was, at all relevant times, Defendant Knizeski—along with copies of relevant building plans, site plans, surveys, and supporting documents.  (*See id.* at XII.A.2–5.)  The Building Inspector could then, in his discretion, approve the application, at which point construction could commence.  (*See id.* at XII.C.1.)

Second, after constructing but before occupying a house, the owner had to obtain a certificate of occupancy ("CO").  (*See id.* at XII.H.)  To do so, "[t]he owner or his/her agent" had to "make [an] application."  (*Id.* at XII.H.4.)  Prior to issuing a CO, the Building Inspector was required to "examine or cause to be examined all buildings, structures and sites for which an application for a Building Permit . . . has been filed."  (*Id.* at XII.I.)  Thereafter, the Building Inspector would determine whether "the proposed work ha[d] been completed in accordance with the applicable building codes, local laws, rules and regulations, and also in accordance with the application, plans[,] and specifications filed in connection with the issuance of the Building Permit."  (*Id.* at XII.J.1.)  Upon finding that the work was completed "in accordance" with these requirements, the Building Inspector was required to issue the CO.  (*See id.* ("When . . . it is found that the proposed work has been completed in accordance with the applicable [requirements], the Building Inspector . . . *shall* issue a [CO]." (emphasis added)).)  However, if the Building Inspector "found that the proposed work ha[d] not been properly completed," he was required to deny the application.  (*See id.* at XII.J.1–2 ("If it is found that the proposed work has not been properly completed, a [CO] . . . *shall not be issued* . . . ." (emphasis added)).)

Plaintiff first sought approval a site plan for the subject property in early 2006.  At a February public hearing before the Planning Board, Atzl (the surveyor) presented a proposal that

4

involved construction of a two-story home and relocation of a "small home" that was already on the site and that Plaintiff wished to use as a pool house.  (*See* Defs.' Decl. Ex. I, at 1 (Planning Board hearing minutes).)  The Planning Board voted to "grant preliminary site plan approval" subject to the condition that Plaintiff obtain a height variance from the ZBA.  (*Id.* at 4.) However, at an April hearing, the ZBA denied Plaintiff's request.  Atzl testified that he had determined that "[t]he elevation at the bottom of the curb at the edge of River Road [was] 29.1 feet," meaning that, to comply with section E, the proposed house could be no taller than 33.6 feet—four-and-a-half feet above River Road.  (Defs.' Decl. Ex. J, at unnumbered 1 (ZBA April 2006 hearing minutes).)[3]  Atzl then testified that the "height of the highest point of the highest roof" of the proposed house was 43.7 feet, meaning that Plaintiff was requesting a variance of 10.1 feet.  (*Id.*)  Initially, one of the ZBA members noted that "the primary issue is where the measurement was taken," because "[t]he elevation of River Road varie[d] significantly along the boundary of the [subject] property"—from 30 feet at the southern end to 24 feet at the northern end.  (*Id.*)  Atzl testified that "he measured from the middle of the lot," where the elevation was 29.1 feet, because "there is no statement [in the code] as to where the height is derived."  (*Id.* at unnumbered 2.)  One ZBA member offered an interpretation of section E that appeared to support Atzl, stating that the measurement should be taken "at any given point above River Road."  (*Id.* at unnumbered 9.)  However, another member stated that "[t]he height should be measured at the lowest point of the road" because "the ordinance was written to protect the views of the community along River Road."  (*Id.*)  A third member appeared to support this

---

[3] To be clear, while each page of this exhibit is numbered, the exhibit is not consecutively paginated.  Moreover, because the exhibit includes minutes from three separate ZBA hearings, certain page numbers repeat.  The Court will therefore refer to pages of the exhibit as if they were unnumbered.

interpretation, which would effectively require applicants to obtain "the maximum variance."
(*Id.*)  Applying that interpretation to Plaintiff's application, that member calculated that the
elevation at the lowest point of the road was 24 feet, triggering an allowable height of 28.5 feet,
and thus requiring Plaintiff to obtain a 15.2-foot variance (53 percent higher than the allowed
height) for his 43.7-foot-high house.  (*See id.*)  Ultimately, although the ZBA did not appear to
adopt a particular interpretation of section E, the hearing minutes indicate that the ZBA
construed Plaintiff's application to request a 53 percent variance (implying that the ZBA
measured from the lowest point of the road), and that it unanimously denied the application so
construed.  (*See id.* at unnumbered 10.)[4]

Plaintiff then sought approval of a revised site plan at a Planning Board hearing held on
September 14, 2006.  Although the Planning Board did not grant approval at that hearing, it
ultimately granted approval after Plaintiff made necessary changes.  (*See* Defs.' 56.1 Statement
¶ 33.)  Apparently, none of the changes related to the height of the proposed house, and Plaintiff
did not have to request a height variance.  Notably, Defendants concede that this site plan "was
within the height and size restrictions of the Village Zoning Law," but it is unclear, from the
record, how the Planning Board made this determination.  (*See id.*)

Subsequently, Knizeski approved Plaintiff's building-permit application on October 19,
2006, (*see* Defs.' Decl. Ex. Q, at unnumbered 3 (building permit); *see also* Pl.'s Decl. Ex. K, at
unnumbered 2 (Letter from Knizeski to Plaintiff, Oct. 19, 2006)), and construction began.

---

[4] Notably, the hearing minutes also indicate that the ZBA found that the "maximum
permitted . . . height" was 30.5 feet above River Road.  (*See* Defs.' Decl. Ex. J, at unnumbered
1.)  This figure is inconsistent with the "lowest point" calculation method the board had
employed during the hearing, which concluded that the maximum permitted height was 28.5 feet
(given that the lowest point was 24 feet).  (*See id.* at unnumbered 9.)  The record does not
contain an explanation for the inconsistency.

Within a month of granting the building permit, and then approximately two weeks after that, Knizeski conducted discretionary on-site inspections of the property and reported "satisfactory results."  (*See* Defs.' Decl. Ex. K, at unnumbered 1–2 (Knizeski's "daily log entries" related to Plaintiff's property); Defs.' Decl. Ex. R, at unnumbered 3–4 (inspection reports).)[5]  Then, in January 2007, apparently after a neighboring property owner alerted him to a potential issue with the house's height, Knizeski requested that Atzl submit a letter certifying that the house would comply with section E.  (*See* Defs.' Decl. Ex. K, at unnumbered 2; Defs.' Decl. Ex. S (Letter from Knizeski to Plaintiff, Jan. 17, 2007 ("[B]e advised that a letter from your engineer will be required as soon as possible to certify that the height of your new house does not exceed that as stated in [section E].").)  Five days later, Atzl submitted the requested letter, noting that his office "performed an 'under construction' survey of the home" and that "[t]he elevations taken [were] in conformance with the approved site [p]lan," in that "[t]he elevation of the highest part of the roof line [would] not be more than [four-and-a-half] feet of the easterly side of River Road."  (Defs.' Decl. Ex. T (Letter from Atzl to Knizeski, Jan. 22, 2007).)  Knizeski received the letter, but no further action was taken until May 23, 2007, when, at a Department Chair meeting attended by Knizeski, the Planning Board Chair, the ZBA Chair, the Village Clerk, and the Village Attorney, the Village Clerk promised to ask John Collazuol ("Collazuol"), the Village Engineer, to confirm Atzl's height certification.  (*See* Defs.' Decl. Ex. K, at unnumbered 2; Defs.' 56.1 Statement ¶ 57.)

---

[5] Knizeski conducted two other discretionary inspections, both in March 2007.  One focused on the framing and plumbing work, and the other focused on the insulation work.  The inspected work was fully approved and partially approved, respectively.  (*See* Defs.' Decl. Ex. R, at unnumbered 1–2.)

Collazuol conducted his own survey and reported the results in a July 2007 letter to the Village Clerk, which stated that "the roof ridge of the new dwelling [was] [four feet nine inches] above the high point of pavement on the easterly side of River Road.  Therefore, the ridge of the building [was] [three inches] greater than allowed."  (Defs.' Decl. Ex. U, at unnumbered 1 (Letter from Collazuol to Village Clerk, July 17, 2007).)  The Parties do not dispute that, in making this determination, Collazuol measured from the highest point of River Road.  (*See* Defs.' 56.1 Statement ¶ 59; Defs.' Decl. Ex. U, at unnumbered 2 (survey drawing, indicating that Collazuol used an elevation of 30 feet and measured a roof-ridge height of 34.75 feet); *see also* Defs.' Decl. Ex. DD, at 15 (Collazuol Dep.)

Plaintiff submitted an application for a CO on August 29, 2007.  (*See* Defs.' 56.1 Statement ¶ 61; Defs.' Decl. Ex. Q, at unnumbered 15 (CO application, submitted by Plaintiff and his wife).)[6]  Shortly thereafter, on September 13, the Planning Board Chair sent a letter to Collazuol requesting "a survey of the roof heights at . . . [five] locations" Atzl used in the site plan as measurement reference points.  (Defs.' Decl. Ex. V (Letter from Planning Board Chair to Collazuol, Sept. 13, 2007).)  Collazuol completed the survey on October 22 and thereafter submitted his results to the Village Clerk in an October 30 letter.  According to Collazuol,

> [t]he [as-built] roof heights . . . [were] somewhat consistent with the site plan . . . except for at [one of the five stations]. . . .  However, due to the circumstances [he found] that the building and roofs [had] been constructed substantially in accordance with the plans submitted by the Architect in that the building [was] no greater in height than that as proposed.

---

[6] The Parties do not address whether the CO application was properly filed by Plaintiff and his wife even though Gladstone owned the property.  However, the Court notes that, per the terms of the CO application itself, the application may be filed by the "owner" or by a "lessee, engineer, surveyor, architect, builder, or agent of the owner."  (*See* Defs.' Decl. Ex. Q, at unnumbered 15 (CO application).)

(Defs.' Decl. Ex. U, at unnumbered 3 (Letter from Collazuol to Village Clerk, Oct. 30, 2007).)

Furthermore, Collazuol recommended that "[t]he diminimous [sic] difference in roof height

should be neglected as [it fell] within typical building tolerances, ie. [sic] 0.90 ft. or 10 inches."

(*Id.*)

       In his letter, Collazuol also included a finding "that the elevations of the road surface

[were] inconsistent with the site plan and are lower than previously indicated." (*Id.*)  This

statement referred to an error in the site plan that Atzl discovered in an as-built survey he

completed on September 18, 2007.  (*See* Defs.' 56.1 Statement ¶ 71.)  In short, although Atzl had

conducted field measurements of the road elevations when he prepared the site plan, in the final

site plan he unintentionally used data from Rockland County topographical maps that turned out

to be incorrect.  (*See* Defs.' Decl. Ex. J, at unnumbered 17–18 (ZBA February 2008 hearing

minutes).)  This resulted in a two-foot discrepancy between the site-plan elevations and the real-

world elevations, such that the allowable height was two feet lower than expected.  (*See id.* at

unnumbered 18.)  Atzl reported his error to Collazuol before Collazuol submitted his October 30

letter, but Collazuol's finding that the house exceeded the height restriction by 10 inches did not

account for the error.  (*See* Defs.' 56.1 Statement ¶¶ 75–78.)

       In response to Collazuol's letter, the Planning Board Chair requested a meeting with

Collazuol to discuss his findings.  (*See* Defs.' Decl. Ex. V, at unnumbered 2 (Letter from

Planning Board Chair to Collazuol, Nov. 9, 2007).)  At that meeting, which was also attended by

the ZBA Chair and the Village Attorney, it was determined that Collazuol would prepare a new

report based on the real-world elevation measurements.  (*See* Defs.' 56.1 Statement ¶¶ 82–85.)

       Collazuol submitted that report on December 11, 2007, in a letter to Knizeski.  (*See*

Defs.' Decl. Ex. U at unnumbered 5–6 (Letter from Collazuol to Knizeski, Dec. 11, 2007).)  A

"Grade Sheet" attached to the letter contained Collazuol's final measurements for the road elevations and as-built roof elevations at the same five measurement stations used in the site plan and in his October 30 report.  (*See id.* at unnumbered 6.)  According to Collazuol's calculations, at the two stations measuring garage-roof elevations, the as-built elevation was lower than the planned elevation, and the as-built elevation fell below the allowable elevation under section E. (*See id.*)  However, at the other three stations, all of which measured a roof elevation at the "highest ridge," the as-built elevation was higher than the planned elevation, and the as-built elevation exceeded the allowable elevation by between 0.83 inches and 2.95 inches.  (*See id.*)  In the letter, Collazuol explained that "[t]he as-built difference in the chart shows that at [one of the five stations], the dimension of 2.95 ft. is greater than allowed," and he noted that "[t]his [was] the maximum difference of all the locations."  (*Id.* at unnumbered 5.)  He further explained that the "roof elevation" at that station was "0.25 ft. greater than the allowable when measured from the edge of River Road along the south property line projected (which elevation [was] 29.25 ft.)."  (*Id.*)  Based entirely on this report, Knizeski sent a letter to Plaintiff on December 12, 2007, informing him that, "[a]t this time, [his] Application for Certificate of Occupancy must be denied based on the Report received from [Collazuol] . . . that confirms that the elevation of roof height exceeds that as described in [section E]."  (Defs.' Decl. Ex. Q, at unnumbered 17 (Letter from Knizeski to Plaintiff, Dec. 12, 2007).)[7]

Plaintiff appealed Knizeski's denial of the CO to the ZBA, requesting that the Village either grant his CO application or grant a height variance.  (*See* Defs.' Decl. Ex. J, at

---

[7] Knizeski sent a letter a week later that purported to supercede the December 12 letter. However, the second letter contained only a minor revision, and was identical to the December 12 letter in all material respects.  (*See* Defs.' Decl. Ex. Q, at unnumbered 16 (Letter from Knizeski to Plaintiff, Dec. 19, 2007).)

unnumbered 12–14.)  Notably, with regard to the former, Plaintiff's specific request was "for an interpretation of the definition of 'height' in the Zoning Law."  (*Id.* at 12.)  The ZBA held two hearings, one on February 26, 2008, and the other on April 7, 2008, to consider Plaintiff's appeal.  (*See* Defs.' Decl. Ex. J, at unnumbered 12, 25.)  At the second hearing, in response to Plaintiff's request for an interpretation of 'height,' the ZBA unanimously passed a motion finding that

> the Zoning Law is not ambiguous with respect to the manner in which building height is measured in the R-10 Zoning District for the reasons that the definition of "Height" in the Zoning Law states that buildings are measured vertically and, when read together with the definition of "Easterly Side of River Road" clearly requires that to determine whether a building height exceeds [four-and-a-half] feet above River Road, the measurement is taken from the point at which the road surface intersects with the curb vertically to the highest point of the roof.  The word "vertical" in Webster's New World Dictionary is defined as "perpendicular, or at a right angle, . . . upright, straight up or down, . . ."

(*Id.* at unnumbered 35.)[8]  In this context, the ZBA also found that Plaintiff "[did] not have standing to raise the question of ambiguity inasmuch as he and his consultants measured the height of the building in accordance with the Zoning Law definition."  (*Id.*)  In other words, the ZBA found that the methodology Plaintiff employed was consistent with the Village Zoning Law.

The ZBA then proceeded to consider Plaintiff's request, in the alternative, for "a variance from [section E] to permit the maintenance and use of a single family dwelling having a height

---

[8] The ZBA's finding references a part of the Zoning Law that the Parties did not submit as part of the record for Defendants' Motion, but that the Parties submitted with previous motions.  Specifically, in Chapter IV, the Zoning Law instructs that "[h]*eight* shall be measured vertically from the mean elevation of the natural ground level along the side of the building with the lowest natural grade to the highest point of the roof, including chimneys."  (*See* Att'y Decl. Ex. F, at 5 (Village Zoning Law, submitted with Plaintiff's declaration filed in support of his first motion for summary judgment) (Dkt. No. 7); *see also* Dkt. No. 11, Ex. A, at 5 (same, submitted with Defendant's 56.1 Statement filed in opposition to Plaintiff's first motion for summary judgment).)

of 7.5 feet above the easterly side of River Road instead of the maximum permitted of 4.5 feet."
(*Id.* at unnumbered 12.)  In light of Plaintiff's argument that lowering the roof would be too
costly and disruptive, the ZBA considered whether Plaintiff would agree to move his pool house
to a different part of the property, and thereby open up a view to the river.  (*See id.* at
unnumbered 21).  Plaintiff's attorney stated that "[Plaintiff] would agree to this," and noted that
it would be "less expensive than re-configuring the top of the house."  (*Id.* at unnumbered 36.)
The ZBA also asked Plaintiff whether it would be less expensive to demolish the pool house
instead of moving it, but Plaintiff noted that "it would still be costly."  (*Id.* at unnumbered 37.)
Plaintiff's wife then testified that "it [was] financially devastating to [her and her husband] to
carry two homes" and, in an apparent effort to achieve a quick resolution of the dispute, Plaintiff
stated that "he would remove the pool house from its current location to mitigate the view if the
height variance [were] granted."  (*Id.* at unnumbered 37–38.)  The ZBA then moved to close the
hearing.  (*Id.* at unnumbered 38.)

      Ultimately, the ZBA unanimously granted Plaintiff's request for a variance, subject to
three conditions:

      1.  That the [pool house] shall be removed from its present location prior to issuance
of a [CO] for the residence;

      2.  That there shall be an open and unobstructed view on the northerly side of the
property for the entire northerly side yard plus an area running in a diagonal line
from the northeasterly corner of the residence through the northeasterly corner of
the existing pool, then to the River . . . ;

      3.  That no structures shall be constructed at any time within the open, unobstructed
area described in [the paragraph outlining the second condition] . . . .

(*Id.* at unnumbered 40.)  The ZBA also made findings necessary to support their decision,
including that "although the variance [was] substantial, the removal of the poolhouse [sic] and
maintenance of the unobstructed river view mitigates the negative impact of the height of the

residence," that "the removal of the poolhouse [sic] is a feasible alternative to requiring the applicant to remove three feet from the height of the house," and that "the benefit to [Plaintiff] by not requiring the removal of three feet of the height of the house [was] great and the detriment to the community [was] lessened by the" variance's conditions.  (*Id.* at unnumbered 41.)

B.  Procedural History

Although at the ZBA hearing Plaintiff appeared to indicate that he would agree to the conditions the ZBA ultimately imposed, Plaintiff ultimately did not comply with the conditions, and he therefore did not obtain either the variance or the CO.  Instead, Plaintiff initiated lawsuits in state and federal court challenging the Village's denial of his CO application.

1.  State Court

On October 9, 2008, Plaintiff filed an Article 78 Petition in New York Supreme Court, alleging that, procedurally, the ZBA's decision failed to comply with New York state laws and that, substantively, the ZBA's "imposition of conditions" on Plaintiff was "unreasonable," "outside of [ZBA's] jurisdiction," and was "not consistent with the spirit and intent of the zoning local law."  (*See* Defs.' Decl. Ex. D (petition).)  On March 31, 2009, the court issued an order denying the petition on the substantive ground, finding that "there [was] nothing irrational or unreasonable about the ZBA's interpretation of the term 'height' in the Village's zoning code," and that there was "nothing impermissible about the conditions [the ZBA] imposed" on Plaintiff's variance.  (*See* Defs.' Decl. Ex. E, at unnumbered 1 (Supreme Court decision).) However, the court granted the petition with regard to one of Plaintiff's procedural arguments, holding that the ZBA violated New York's Open Meetings Law, N.Y. Pub. Off. Law §§ 100 et seq., because the ZBA "vot[ed] on the resolution in question in closed session at the April 7, 2008 meeting."  (*Id.* at unnumbered 2.)  The court then "annulled" the ZBA's decision

13

and remanded the matter to the ZBA "for formal decision in open session on the petitioner's application for a variance."  (*Id.* at unnumbered 1.)

Defendants appealed that decision, and on April 20, 2010, the Appellate Division reversed the Supreme Court's judgment on the procedural ground, holding that the lower court correctly found that the ZBA violated the Open Meetings Law, but that the court "improperly annulled the ZBA's determination on th[at] basis."  (Defs.' Decl. Ex. F, at 2–3 (Appellate Division decision).)  The court therefore "confirmed" the ZBA's determination and "dismissed [the proceeding] on the merits."  (*Id.* at 2.)

### 2.  Federal District Court

On the same day that Plaintiff filed his Article 78 Petition, he filed a civil action in New York Supreme Court against Defendants and against Atzl and Atzl's firm ("Atzl Defendants"), alleging that section E was unconstitutionally vague, both on its face and as applied to Plaintiff, and that Defendants deprived him of substantive due process, entitling him to damages under 42 U.S.C. § 1983, and alleging that Atzl Defendants "were negligent in the performance of surveying" Plaintiff's land, entitling him to damages under state law.  (*See* Compl. ¶¶ 22–40 (Dkt. No. 1).)  Defendants removed the action to federal court on November 5, 2008.  (*See* Dkt. No. 1.)

The case was originally assigned to Judge Conner, who allowed Plaintiff to file a Motion for Summary Judgment against Defendants in January 2009.  (*See* Dkt. No. 6.)  In addition to opposing that Motion, Defendants filed a Motion To Dismiss in February 2009.  (*See* Dkt. No. 13.)  Before Judge Conner decided those motions, the case was reassigned to this Court in July 2009.  (*See* Dkt. No. 27.)  Shortly thereafter, the case was again reassigned, this time to Judge

William Young, a judge from the District of Massachusetts who was sitting by designation in the Southern District of New York.  (*See* Dkt. No. 28.)

After holding oral argument on the Parties' motions in October 2009, Judge Young issued an Order, on December 18, 2009, granting summary judgment for Defendants in full. (*See* Mem. & Order (Dkt. No. 31).)[9]  First, Judge Young rejected Plaintiff's as-applied claim, holding that "a person of reasonable intelligence could discern[] what activities are prohibited," (*id.* at 8), and recognizing that "the ordinance could encourage potentially arbitrary or ad hoc enforcement," (*id.* at 11), but nevertheless holding that Plaintiff's property "[fell] within the core goals of [section E]" and that it "fell squarely within the proscribed height" as defined by the statute's "core meaning," (*id.* at 11–12).[10]  Second, Judge Young rejected Plaintiff's facial claim, holding that Plaintiff could not meet his burden to show that section E "is impermissibly vague in all of its applications" where he had failed to show that section E was impermissibly vague in his own application.  (*See id.* at 14–15.)  Finally, Judge Young rejected Plaintiff's substantive-

---

[9] Judge Young converted Defendants' motion to dismiss into a motion for summary judgment because "both parties refer[ed] th[e] [c]ourt to exhibits beyond the four walls of the complaint."  (Mem. & Order at 1.)

[10] Judge Young interpreted section E to mean that "any point on River Road to the Hudson River must be free of any view-obstructing structures that exceed the height requirements," such that a measurement to determine compliance with section E "must evaluate whether any structure between [any] arbitrary point [on River Road] and the Hudson violates the regulation."  (Mem. & Order at 11–12.)  Effectively, this interpretation is equivalent to requiring a measurement only at the lowest elevation on River Road and comparing it to the highest point of the building, because if that measurement complied with section E, it would be impossible to find noncompliance at any other "arbitrary point" on River Road higher than the lowest elevation when measured against the exact same point of the building.  Notably, this is one of the interpretations the Planning Board offered at the April 2006 public hearing.  (*See* Defs.' Decl. Ex. J, at unnumbered 9 (noting that one board member thought that "[t]he height should be measured at the lowest point of the road," and that another board member questioned whether "the height should be measured so that the maximum variance would be needed," such that "[t]he distance would be measured from the lowest point along River Road to the highest point of the house").)

15

due-process claim, holding that Plaintiff had no constitutionally protected property interest in the CO "[b]ecause the property was not in compliance with a zoning law," and thus Knizeski "used his discretion to properly deny the [CO]." (*Id.* at 16.) Accordingly, Judge Young granted summary judgment for Defendants and he entered an Order dismissing the case. (*See* Dkt. No. 32 (Judgment, filed Dec. 21, 2009).)

Shortly after Judge Young entered the judgment, Plaintiff filed what Judge Young interpreted to be a motion for reconsideration, arguing that Judge Young should not have dismissed the entire case because the Parties' motions addressed only Plaintiff's claims against Defendants, and thus the court's order should not have dismissed Plaintiff's claim against Atzl Defendants. (*See* Dkt. No. 33.) Judge Young granted Plaintiff's Motion, and on January 20, 2010, he entered an amended judgment vacating the prior judgment in full, entering judgment "in favor of the Village defendants only," and remanding the case "to the New York Supreme Court for the state law malpractice claim against [Atzl Defendants]." (Dkt. No. 34 (Amended Judgment, filed Jan. 20, 2010).) In January 2012, Plaintiff and Atzl Defendants settled their claim for $175,000. (*See* Defs.' 56.1 Statement ¶ 112 & n.1.)

### 3. The Second Circuit

Plaintiff appealed Judge Young's decision to the Second Circuit, which reversed in part and vacated in part. *See Cunney v. Bd. of Trs.*, 660 F.3d 612 (2d Cir. 2011).[11] With regard to Plaintiff's void-for-vagueness claim, the Second Circuit held that section E was

---

[11] The Second Circuit's decision is also part of the docket and part of the record filed in connection with Defendants' Motion. (*See* Dkt. No. 39; Defs.' Decl. Ex. G.)

unconstitutionally vague as applied to Plaintiff for two independent reasons.[12]  First, it found that section E "fail[ed] to give specific notice of how a permit applicant should design his site plan so that [a] proposed building complies with that restriction," and that "it also fail[ed] to provide an objective standard that the Village itself [could] apply in determining the project's compliance once an application has been submitted and thereafter when an approved project has been built." *Id.* at 621.  In this way, section E violated Plaintiff's right to due process because "'it fail[ed] to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits.'"  *Id.* (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000)).  Second, it found, like Judge Young, that section E "'could encourage potentially arbitrary or ad hoc enforcement," *id.* at 623 (quoting *Cunney v. Bd. of Trs.*, 675 F. Supp. 2d 394, 400 (S.D.N.Y. 2009)); *see also id.* at 621 (noting that "a law is unconstitutionally vague 'if it authorizes or even encourages arbitrary and discriminatory enforcement'" (quoting *Hill*, 530 U.S. at 732)), but it also found, unlike Judge Young, that section E "as applied to the design and construction of [Plaintiff's] house [was] not saved by resort to a clear core . . . . because, under a reasonable interpretation of the ordinance, [Plaintiff's] house, as built, does comply with section E."  *Id.* at 623–24.  The court therefore "reverse[d] the district court's grant of summary judgment in favor of [Defendants] on [this] claim" and "direct[ed] the district court to enter summary judgment in favor of [Plaintiff]."  *Id.* at 626.

Next, with regard to Plaintiff's substantive-due-process claim, the court recognized that "[t]he district court's rationale in denying [that] claim turned on its denial of his void-for-vagueness claim, which [the court] [had] [just] reversed."  *Id.* at 626.  Indeed, Judge Young had

---

[12] The Second Circuit did not consider Judge Young's ruling on Plaintiff's facial claim because Plaintiff apparently "ha[d] not argued or characterized his claim on appeal" to include a facial claim.  *Cunney*, 660 F.3d at 620 n.2.

held that Plaintiff did not have a constitutionally protected property interest in the CO because his house violated section E, but the Second Circuit had held that section E "may not be applied as a basis for denying [Plaintiff] [the] CO" because it was "unconstitutionally vague." *Id.*  The court therefore opted to "leave it to the district court to decide in the first instance the viability and merits of [Plaintiff's] substantive due process claim." *Id.*  Accordingly, it "vacate[d] the grant of summary judgment in favor of [Defendants] on [this] claim, and remand[ed] for further proceedings consistent with [its] opinion." *Id.*

Following the Second Circuit's ruling, the Village issued a CO for the subject property on November 9, 2011.  (*See* Defs.' Decl. Ex. Q, at unnumbered 14 (Certificate of Occupancy).)  The CO was issued after a final inspection and was apparently unaccompanied by any height-related conditions or a variance.  (*See* Defs.' 56.1 Statement ¶ 111.)  Moreover, the CO was issued to Gladstone, (*see* Defs.' Decl. Ex. Q, at unnumbered 14), which was the property owner at the time of issuance and remained the property owner until August 9, 2013, when Gladstone conveyed the property to Plaintiff, (*see* Defs.' Decl. Ex. N, at unnumbered 4–6 (unofficial copy of recorded conveyance, dated Aug. 9, 2013)).

### 4.  Remand

After the Second Circuit issued its order, the case was reassigned to this Court.  (*See* Dkt. No. 37 (notice of reassignment, dated Nov. 20, 2011).)  On December 22, 2011, Defendants sent a letter requesting permission "to file a motion to determine whether [Plaintiff] may recover compensatory damages for the [Second Circuit's] finding that [section E] was void for vagueness."  (*See* Dkt. No. 42 (Letter from Samantha Vélez to Court, Dec. 22, 2011).)  At a hearing held on December 11, 2012, after a review of case law from within and outside of the Second Circuit, the Court concluded that "Plaintiff may be awarded damages solely on his . . .

void for vagueness claim." (Defs.' Decl. Ex. H, at 20–21 (Hr'g Tr., Dec. 11, 2012 Hr'g).) But the Court clarified that its conclusion "[did not] mean that the Court [had] made any particular finding as to what could be qualified or what could constitute such damages and whether or not Plaintiff has made out a case that the damages he claims he suffered were the result of the vague statute itself or the vague ordinance." (*Id.* at 21.) The Court continued,

> [W]hat [Plaintiff] is going to have to do is prove actual injury resulting from his due process violation as a result of the void for vagueness. So he's going to have to show damages that were directly caused by the due process violation as explained by the Second Circuit in the context of the void for vagueness doctrine. In other words, that but for the due process violation, [Plaintiff] would not have suffered the claimed damages.

(*Id.*) It then issued an Order memorializing its conclusion "that Plaintiff may receive damages for his void-for-vagueness claim." (Dkt. No. 47 (Order, dated December 12, 2012).)

The Parties then proceeded to discovery, which continued throughout late 2013. Near the end of that process, the Court adopted a scheduling order at a conference held on October 18, 2013. (*See* Dkt. No. 55.) Pursuant to that Order, Defendants filed their Motion for Summary Judgment on January 17, 2014, (*see* Mot. (Dkt. No. 57); Mem. of Law in Supp. of the Village Defs.' Mot. for Summ. J. ("Defs.' Mem.") (Dkt. No. 66)), Plaintiff filed his Opposition Memorandum on February 18, 2014, (*see* Pl.'s Revised Mem. of Law in Opp'n to Defs.' 3d Mot. for Summ. J. ("Pl.'s Mem.") (Dkt. No. 70)), and Defendants filed their Reply Memorandum on March 3, 2014, (*see* Reply Mem. of Law in Opp'n & in Further Supp. of the Village Defs.' Mot. for Summ. J. ("Defs.' Reply Mem.") (Dkt. No. 72)). The Court now turns to a discussion of Defendants' Motion.

## II.  DISCUSSION

A.  Standard of Review

Summary judgment shall be granted where the movant shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law."  *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene of City of N.Y.*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted).  Moreover, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."  *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, MDL No. 1358, No. M21-88, 2014 WL 840955, at *2 (S.D.N.Y. Mar. 3, 2014) (same).  Thus, a court's goal should be "to isolate and dispose of factually unsupported claims."  *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks omitted) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)); *see also Schatzki v. Weiser Capital Mgmt., LLC*, No. 10-CV-4685, 2013 WL 6189465, at *14 (S.D.N.Y. Nov. 26, 2013) (same).

"In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant."  *Brod*, 653 F.3d at 164 (internal quotation marks omitted); *see also Borough of Upper Saddle River, N.J. v. Rockland Cnty. Sewer Dist. No. 1*, — F. Supp. 2d —, 2014 WL 1621292, at *12 (S.D.N.Y. Apr. 22, 2014) (same).  Additionally, "[i]t is the movant's burden to show that no genuine factual dispute exists."  *Vt.*

*Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004); *see also Aurora Commercial Corp. v. Approved Funding Corp.*, No. 13-CV-230, 2014 WL 1386633, at *2 (S.D.N.Y. Apr. 9, 2014) (same).  "However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."  *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alterations and internal quotation marks omitted).  Further, "[t]o survive a [summary judgment] motion . . . , [a non-movant] need[s] to create more than a metaphysical possibility that his allegations were correct; he need[s] to come forward with specific facts showing that there is a genuine issue for trial," *Wrobel v. Cnty. of Erie,* 692 F.3d 22, 30 (2d Cir. 2012) (emphasis and internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), and "cannot rely on the mere allegations or denials contained in the pleadings," *Walker v. City of New York*, No. 11-CV-2941, 2014 WL 1244778, at *5 (S.D.N.Y. Mar. 26, 2014) (internal quotation marks omitted) (citing, inter alia, *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . .")).

B.  Analysis

Defendants' Motion raises four issues.  First, Defendants argue that Defendants Knizeski and the ZBA should be dismissed from the case because, respectively, the Village is the real party in interest, and the ZBA is not a suable entity.  (*See* Defs.' Mem. 16–17.)  Second,

Defendants argue that Plaintiff lacks standing to bring his claim because he was not the owner of the subject property until August 9, 2013, when Gladstone conveyed the property deed to Plaintiff. (*See id.* at 4–6.) Third, Defendants seek summary judgment on Plaintiff's substantive-due-process claim, arguing that Plaintiff did not have a constitutionally protected property interest in the CO and that Defendants' actions were not so arbitrary and outrageous that they violated Plaintiff's constitutional rights. (*See id.* at 6–10.) Fourth, Defendants argue that Plaintiff cannot establish proximate cause for certain of his damages claims, and that, to the extent Plaintiff receives damages, Defendants are entitled to a set-off of the award in light of Plaintiff's settlement with Atzl Defendants. (*See id.* at 11–16, 18–19.) After an overview of Plaintiff's claims and the issues left open to the Court on remand, the Court will address each argument in turn.

## 1. Plaintiff's Claims

Plaintiff's Complaint alleges a single cause of action against Defendants under § 1983, but it has been interpreted throughout this litigation to allege three constitutional violations—namely, a facial vagueness challenge, an as-applied vagueness challenge, and a substantive-due-process challenge. (*See* Dkt. No. 8, at 2–7 (Pl.'s Mem. of Law in Supp. of Mot. for Partial Summ. J.); Dkt. No. 31 (district court Order granting summary judgment for Defendants); Dkt. No. 39 (Second Circuit order reversing in part and vacating in part the district court Order).)[13]  In

---

[13] The Complaint also alleges that Defendants deprived Plaintiff of his "rights under the First . . . Amendment[]," but Plaintiff has not raised this claim at any point in the litigation. (*See* Compl. ¶¶ 28, 30.) Moreover, at one point Defendants interpreted the Complaint to raise an equal protection claim, and sought dismissal of that claim, but Plaintiff did not respond to this argument and Judge Young did not address it in his order granting Defendants' motion. (*See* Dkt. No. 14, at 4–6 (Defendants' Memorandum in support of their Motion To Dismiss); Dkt. No. 21 (Plaintiff's Memorandum in opposition to Defendants' Motion To Dismiss); Dkt. No. 31 (Order granting Defendants' Motion).)

general, void-for-vagueness claims and substantive-due-process claims challenging state action arise under the same constitutional provision, which protects individuals from "depriv[ations] . . . of life, liberty, or property, without due process of law."  U.S. Const. amend. xiv; *see also Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."); *Farrell v. Burke*, 449 F.3d 470, 485 (2d Cir. 2006) ("The vagueness doctrine is a component of the right to due process."); *Monserrate v. N.Y. State Senate*, 695 F. Supp. 2d 80, 95 (S.D.N.Y. 2010) (analyzing vagueness claim under Fourteenth Amendment Due Process Clause), *aff'd*, 599 F. 3d 148 (2d Cir. 2010).  Perhaps for this reason, the Complaint itself is somewhat unclear as to how Plaintiff's claims differ from each other.  However, subsequent conduct in the litigation has helped resolve some of the ambiguity, and the Court will take this opportunity to hopefully add additional clarity.

In his void-for-vagueness claim, Plaintiff challenges the *text* of section E, arguing, essentially, that the ordinance's vagueness denied Plaintiff his due process right to understand what the ordinance says in the context of his specific desire to comply with it.  (*See* Compl. ¶ 27 (alleging that "[t]he definition for measuring . . . height . . . was undertaken in a manner that a reasonable and prudent person would not understand when the actions of any individual property owner would or would not be in violation of any height or any other restrictions or requirements"); *id.* ¶ 32 ("The Village Defendants violated Plaintiff's clearly established constitutional . . . rights regarding what a reasonable person would know regarding limitations under building height with the Village Zoning Code.").)  This characterization is consistent with the Second Circuit's treatment of Plaintiff's as-applied-vagueness claim, which, according to the court, implicated one of "the most fundamental protections of due process[,] . . . that no one may

23

be required at peril of life, liberty or property to *speculate* as to the meaning of . . . statutes," and that "[a]ll are entitled to be *informed* as to what the State commands or forbids." *Cunney*, 660 F.3d at 620 (emphasis added) (some alterations and internal quotation marks omitted). Moreover, it is consistent with the court's recognition that, in its review of this claim, it was "relegated to the words of the ordinance itself" and to the "interpretations" of the statute given to it by lower courts and "those charged with enforcing it." *Id.* at 621 (alterations and internal quotation marks). Finally, it is consistent with the court's description of the deprivation of due process the Plaintiff suffered in the context of this claim. *See id.* (finding that section E "fail[ed] to give specific *notice* of how a permit applicant should design his site plan so that the proposed building complies with th[e] restriction"); *id.* at 622 (holding that "section E . . . provides no standard that can be objectively applied *to determine if the conduct at issue* . . . complies with the ordinance's restrictions").

By contrast, in his substantive-due-process claim, Plaintiff challenges Defendants' *denial* of his CO application, arguing that Defendants' *actions* denied Plaintiff his due process right to be free from arbitrary and irrational conduct. (*See* Pl.'s Mem. 14 (alleging that "Defendants *acted* in an arbitrary and irrational manner in depriving [Plaintiff] of [his] property interest" in the CO (emphasis added)); Defs.' Decl. Ex. H, at 4 ("THE COURT: . . . [w]hat is the substantive due process claim as distinguished from the void for vagueness claim? MS. MARZOLLA: I believe it was exactly that [Plaintiff] [was] entitled to the C.O. but for this application and this deliberate indifference to the standards set forth in the Code. . . . [Kniezeski] was *acting* according to [an instruction by the Village] as opposed to what he should have been doing under the law." (emphasis added)).)

24

It is important to recognize this distinction between the *words* of the ordinance and the

*actions* of Defendants because the denial of due process related to each claim implicates separate

and distinct interests.  Whereas Plaintiff's vagueness claim alleges that he was forced to

speculate as to the meaning of the ordinance and was thereby deprived of liberty and/or property

interests associated with the speculation, Plaintiff's substantive-due-process claim alleges that

Defendants acted arbitrarily and outrageously and thereby deprived him of his property interest

in the CO. [14]  This distinction becomes even clearer when one recognizes that Plaintiff may have

---

[14] The Court notes that all of the cases the Second Circuit cited in its discussion of Plaintiff's due process claim referenced a specific liberty interest other than a general right to be free from speculation, such as a right to be free from civil or criminal punishment, or the First Amendment right to free speech.  *See United States v. Williams*, 553 U.S. 285, 306 (2008) (criminal punishment and free speech) *Hill*, 530 U.S. at 732 (criminal punishment and free speech); *Smith v. Goguen*, 415 U.S. 566, 572–73 (1974) (criminal punishment and free speech); *Grayned*, 408 U.S. at 108–09 (criminal punishment and free speech); *Cramp v. Bd. of Pub. Instruction*, 368 U.S. 278, 283 (1961) (criminal punishment and free speech); *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 186 (2d Cir. 2010) (free speech); *Rubin v. Garvin*, 544 F.3d 461, 467–68 (2d Cir. 2008) (criminal punishment); *Thibodeau v. Portuondo*, 486 F.3d 61, 66 (2d Cir. 2007) (criminal punishment); *Farrell*, 449 F.3d at 482 (criminal punishment and free speech); *Rock of Ages Corp. v. Sec'y of Labor*, 170 F.3d 148, 156 (2d Cir. 1999) (civil and criminal liability); *Brache v. Westchester Cnty.*, 658 F.2d 47, 51 (2d Cir. 1981) (criminal liability).  But here, Plaintiff has not alleged that the vague ordinance implicated a similar liberty interest, and he has not otherwise identified a liberty interest other than his right to know what the law says.  *Cf. Olim v. Wakinekona*, 461 U.S. 238, 250 (1983) ("Process is not an end in itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement."); *Holcomb v. Lykens*, 337 F.3d 217, 224 (2d Cir. 2003) (same).
    It is possible that the Second Circuit grounded its holding in a property interest. However, it is unlikely that the court did so based on a property interest in the CO.  The Second Circuit never mentioned the CO in its analysis of the void-for-vagueness claim; instead, every mention of what might be considered a "property" interest appeared to refer to Plaintiff's actual plot of land.  *See Cunney*, 660 F.3d at 624 ("Our review of the record gives us substantial concern that the ordinance was arbitrarily applied to [Plaintiff's] property."); *id.* at 625 ("[B]ecause River Road's elevation . . . fluctuates . . . along the boundary of [Plaintiff's] property . . . the application of these interpretations to [Plaintiff's] property would undoubtedly lead to divergent results."); *id.* ("We therefore hold that because section E's terms provided the Village enforcement officers with unfettered latitude in making compliance determinations regarding [Plaintiff's] property, section E, as applied here, is unconstitutionally vague." (citation omitted)). Moreover, although the district court specifically held that Plaintiff had no property interest in the CO, *see Cunney*, 675 F. Supp. 2d at 403 (concluding that Plaintiff "never possessed a

had a cognizable vagueness claim even if Defendants granted the CO; in that context, he could argue that his efforts to comply with section E, though ultimately successful, deprived him of his right to understand the meaning of the ordinance while attempting to comply with it, and he could claim damages associated with the speculation itself. (*See* Defs.' Decl. Ex. H, at 12) (recognizing Plaintiff's possible damages claim based on the fact "that he went to great expense to try to get the C.O. and the reason why he had to endure such expense was because the ordinance was vague").) Moreover, although the Second Circuit has granted summary judgment for Plaintiff on what courts commonly characterize as an "as-applied" void-for-vagueness claim, the meaning of the "as-applied" label in this context should not be misconstrued. It cannot be true, in this case, that because Plaintiff won his as-applied-vagueness claim, he is automatically entitled to damages resulting from the *actual application* of the vague law. Such a rule would effectively supplant the relatively high standards courts have applied to substantive-due-process claims analyzing a defendant's *conduct* with the comparatively lower standards courts have applied to as-applied-vagueness claims analyzing a law's *abstract ambiguity* in the context of a plaintiff's particular fact pattern. *Compare Cunney*, 660 F.3d at 620–21 (recognizing that "a statute's language may be so vague as to deny due process of law" if it, (1) "fails to provide people of ordinary intelligence a reasonable opportunity to *understand* what conduct it prohibits," or (2) "*authorizes* or even encourages arbitrary and discriminatory enforcement"

---

protectable property right to occupy the Property"), the Second Circuit did not discuss this holding, but instead vacated the district court's ruling on that claim and "[left] it to [this Court] to decide in the first instance the viability and merits of [Plaintiff's] substantive due process claim," *Cunney*, 660 F.3d at 626. Finally, as the rest of this Opinion will make clear, Second Circuit precedent appears to foreclose the possibility of bringing a substantive-due-process claim based on a clear-entitlement theory where a plaintiff also alleges a void-for-vagueness claim, at least on the facts present here. It is unlikely that the Second Circuit, in this case, intended to overrule or create a nuanced exception to that precedent without discussing the issue.

(emphasis added)), *with Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999)

("Substantive due process is an outer limit on the legitimacy of governmental *action*. It does not

forbid governmental *actions* that might fairly be deemed arbitrary or capricious and for that

reason correctable in a state court lawsuit seeking review of administrative action. Substantive

due process standards are violated *only* by *conduct* that is *so outrageously arbitrary* as to

constitute a *gross abuse* of governmental authority." (emphasis added)).[15]  Therefore, in

analyzing Plaintiff's claims, the Court is mindful that the void-for-vagueness claim involves only

the constitutional violation associated with Plaintiff's speculation, whereas the substantive-due-

process claim involves only the constitutional violation associated with Defendants' allegedly

arbitrary actions.  With this in mind, the Court turns to Defendants' arguments.

### 2.  Defendants Knizeski and ZBA

At the outset, the Court will address Defendants' argument that neither Defendant

Knizeski nor Defendant ZBA is a suable party for the purposes of Plaintiff's claim for damages

under § 1983.  Plaintiff has sued Defendant Knizeski only in his official capacity as Building

Inspector for the Village, and he has sued Defendant ZBA, a municipal department of the

Village, in addition to suing the Village itself.  (*See* Compl.)  Defendants argue, with respect to

Defendant Knizeski, that "[i]t is well settled that a suit against a municipal official in his official

capacity is tantamount to a suit against the municipality," (Defs.' Mem. 16), and, with respect to

Defendant ZBA, that "municipal departments . . . which are 'merely administrative arms of a

---

[15] It may be true that a fact-finder is more likely to find official conduct to be
outrageously arbitrary when an official applies an unconstitutionally vague statute.  However, at
least in a case like this one, vagueness does not correspond directly to outrageously arbitrary
conduct—indeed, if it did, the Second Circuit would not have remanded the case to this Court "to
decide in the first instance the viability and merits of [Plaintiff's] substantive due process claim."
*Cunney*, 660 F.3d at 626.

municipality do not have a legal identity separate and apart from the municipality' and cannot be sued as an entity," (*id.* at 17 (quoting *Fanelli v. Town of Harrison*, 46 F. Supp. 2d 254, 257 (S.D.N.Y. 1999))).  Plaintiff, as Defendants point out, failed to address these arguments in his Memorandum.  (*See* Defs.' Reply 1.)[16]

> In *Kentucky v. Graham*, 473 U.S. 159 (1985), the Supreme Court explained that
>
> [o]fficial-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent. . . .  It is *not* a suit against the official personally, for the real party in interest is the entity.  Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself.

*Id.* at 165–66 (internal quotation marks omitted); *see also Lore v. City of Syracuse*, 670 F.3d 127, 168 (2d Cir. 2012) (same); *cf. Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.  As such, it is no different from a suit against the State itself." (citation omitted)).  Therefore, because, in addition to suing the Village, Plaintiff has sued Knizeski only in his official capacity, the Court dismisses Plaintiff's claims against Knizeski. *See Liang v. City of New York*, No. 10-CV-3089, 2013 WL 5366394, at *17 (E.D.N.Y. Sept. 24, 2013) (dismissing official-capacity claims, under Rule 12(b)(6), where the plaintiff alleged identical claims against a municipality); *Mercier v. Kelly*, No. 10-CV-7951, 2013 WL 4452486, at *1, *6–7 (S.D.N.Y. Aug. 19, 2013) (granting summary judgment for the same reason); *see also Phillips v. Cnty. of Orange*, 894 F. Supp. 2d 345, 384 n.35 (S.D.N.Y. 2012) ("Within the Second Circuit, where a plaintiff names both the municipal entity and an official in his or her

---

[16] To be clear, the Court grants Defendants' Motion on these arguments on the merits— not because, as Defendants argue, Plaintiff has "abandoned th[e]se claims."  (*See* Defs.' Reply 1.)

official capacity, district courts have consistently dismissed the official capacity claims as redundant.").

With respect to Plaintiff's claims against Defendant ZBA, "[i]t is well-established that under New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and therefore, cannot sue or be sued." *Martinez v. Cnty. of Suffolk*, — F. Supp. 2d —, 2014 WL 775058, at *3 (E.D.N.Y. Feb. 27, 2014) (internal quotation marks omitted); *see also Mulvihill v. New York*, 956 F. Supp. 2d 425, 427 (W.D.N.Y. 2013) (same); *Henry-Lee v. City of New York*, 746 F. Supp. 2d 546, 559 n.11 (S.D.N.Y. 2010) (same).  Here, the ZBA is "merely [an] administrative arm[]" of Defendant Village.  (*See* Village Zoning Law, at XIII (establishing ZBA and granting it specific powers and duties).)  *See also* N.Y. Town Law § 267(2) (mandating that "[e]ach town board which adopts a [zoning law or ordinance] . . . shall appoint a board of appeals"); *id.* § 261 (authorizing a town board "by local law or ordinance to regulate and restrict the height, number of stories[,] and size of buildings and other structures," and specifying that "[s]uch regulations may provide that a board of appeals may determine and vary their application"); *cf. Roman Catholic Diocese of Rockville Centre, N.Y. v. Inc. Vill. of Old Westbury*, No. 09-CV-5195, 2011 WL 666252, at *17 (E.D.N.Y. Feb. 14, 2011) (noting that, in the context of an application to the municipality "for a modification of [a] special use permit," a zoning board of appeals "acted as the lead agency for purposes of the SEQRA review"); *Omnipoint Commc'ns, Inc. v. Town of LaGrange*, 658 F. Supp. 2d 539, 552 (S.D.N.Y. 2009) (finding, where the plaintiff sued a town and its zoning board of appeals, its building department, and its planning board under the federal Telecommunications Act, that "the only proper municipal party defendant" was the town); *Ultimate Custom Cycles, Inc. v. Town of Greenburgh*, No. 98-CV-5914, 1999 WL 135201, at *1 (S.D.N.Y. Mar. 11, 1999)

29

(noting that a defendant town was "a municipal entity created and authorized under the laws of

the State of New York," that it was "authorized by law to maintain a Zoning Board of Appeals,"

and that a defendant zoning board of appeals was "an agency created by [the defendant town] to

act for [the town] in matters related to zoning," but denying the claims against the town and the

zoning board on the merits without considering whether the zoning board was a suable entity).

The Court thus dismisses Plaintiff's claims against ZBA.  *See Martinez*, 2014 WL 775058, at *3

(dismissing claims against a police department where the plaintiff also sued the county); *Burbar

v. Inc. Vill. of Garden City*, 961 F. Supp. 2d 462, 471–72 (E.D.N.Y. 2013) (same, where plaintiff

also sued a village instead of a county); *Mulvihill*, 956 F. Supp. 2d at 427–28 (dismissing claims

against a department of social services while noting that "the proper defendant would be [the

county]").

### 3.  Standing

Defendants next argue that Plaintiff does not have Article III standing to litigate his

claims.  (*See* Defs.' Mem. 4–6.)[17]  Essentially, they claim that "[i]t is undisputed that the plaintiff

---

[17] Plaintiff generally argues that many of Defendants' arguments "are barred by the law of the case doctrine," (*see* Pl.'s Mem. 1), which "requires a trial court to follow an appellate court's previous ruling on an issue in the same case," *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002).  However, notwithstanding the Second Circuit's order "direct[ing] [this Court] to enter summary judgment in favor of [Plaintiff]" on his void-for-vagueness claim, *Cunney*, 660 F.3d at 626, the Court has an "independent obligation" to evaluate Defendants' standing argument—especially where the Second Circuit did not directly address whether Plaintiff has standing.  *See Astrazeneca AB v. Apotex Corp.*, 985 F. Supp. 2d 452, 494 (S.D.N.Y. 2013) ("In light of the court's 'independent obligation to examine [its] own jurisdiction, it would be unwise to avoid the question of standing by means of the law of the case doctrine where no court in this litigation has explicitly addressed the issue." (citation omitted) (alteration in original) (quoting *United States v. Hayes*, 515 U.S. 737, 742 (1995))); *Precision Assocs., Inc. v. Panalpina World Transp., (Holding) Ltd.*, No. 08-CV-42, 2013 WL 6481195, at *11 n.10 (E.D.N.Y. Sept. 20, 2013) (rejecting the plaintiffs' claim that a previous order denying a motion to dismiss a claim prevented the court from evaluating the defendants' motion to dismiss on standing grounds because, in the context of the previous order, "[t]he defendants did not move to dismiss [that claim] on standing grounds and thus the court did not address the plaintiffs'

was not the owner of the . . . property at the time that the request for a [CO] was denied, the [ZBA] hearings were conducted, when he filed the Complaint[,] or even during most of the time that this case has been proceeding," and therefore Plaintiff cannot recover damages for injuries suffered by the true property owner.  (*Id.* at 4.)  Plaintiff concedes that he did not own the property during the period Defendant identified, but nevertheless argues that he was "prevented from living at the newly constructed home and incurred significant associated financial loss as a direct result of Defendants' enforcement of the unconstitutional ordinance."  (Pl.'s Mem. 3.)

"To establish Article III standing, a plaintiff must show (1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'"  *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2341 (2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)); *see also E.M. v. N.Y.C. Dep't of Educ.*, 758 F.3d 442, 449–50 (2d Cir. 2014) (same).  Moreover, "[t]he party invoking federal jurisdiction bears the burden of establishing standing."  *Driehaus*, 134 S. Ct. at 2342 (internal quotation marks omitted).

Here, Plaintiff satisfies that burden.  First, Plaintiff alleges that, notwithstanding Gladstone's ownership of the subject property, he has *personally* suffered various forms of "financial loss," including but not limited to "permanent loss in value assessed at $902,080," "lost interest on profit," "temporary loss of use assessed at $8,000 per month," "carrying costs on the property in excess of $315,000," and "attorney and professional fees in the underlying ZBA and state court challenges . . . in excess of $30,000."  (Pl.'s Mem. 3; *see also* Pl.'s Decl. Ex. D

standing as to that claim"); *see also Schulz v. Kellner*, No. 07-CV-943, 2011 WL 2669456, at *4 (N.D.N.Y. July 7, 2011) (noting that "[c]ourts in [the Second Circuit] have found that questions of subject matter jurisdiction are generally exempt from law of the case principles," and collecting cases).

(Pl.'s Aff.) ¶¶ 15–16 (averring that "Gladstone Estates had no income so [Plaintiff] had to put the money in, directly or via [another] account," and that he and his wife "had spent approximately $2,500,000" on the house by the time the CO was issued); Pl.'s Decl. Ex. E (Aff. of Michael Cunney) ¶ 4 (averring that Plaintiff "capitalize[d]" Gladstone "to purchase, develop, and build the property, at his own expense").)  This satisfies the injury-in-fact requirement.  *See Natural Res. Def. Council, Inc. v. U.S. Food & Drug Admin.*, 710 F.3d 71, 85 (2d Cir. 2013) ("Even a small financial loss is an injury for purposes of Article III standing."); *Miller v. Wells Fargo Bank, N.A.*, 994 F. Supp. 2d 542, 550 (S.D.N.Y. 2014) ("Clearly, economic injuries . . . are judicially cognizable.").

Second, Plaintiff alleges that he suffered this financial loss as a direct result of Defendants' unconstitutional enforcement of the zoning law.  Specifically, Plaintiff argues that he incurred expenses associated with section E's vagueness, such as commissioning multiple sets of plans and attempting to conform with the ordinance.  (*See* Defs.' Decl. Ex. H, at 12.)  Plaintiff also argues that Defendants' actions deprived him of the CO and that, "[a]bsent the CO, the home was rendered without use or value."  (Pl.'s Mem. 9.)  These allegations satisfy Article III's causation requirement, which, in the context of this case, tests only whether Plaintiff's injuries are "fairly traceable" to Defendant's conduct.  *See Garelick v. Sullivan*, 987 F.2d 913, 919 (2d Cir. 1993) ("The causation component of the Article III standing test insures that the injury alleged by a plaintiff is attributable to the defendant. . . .  The plaintiff's injury . . . must be fairly traceable to the allegedly illegal government conduct, . . . . [and a] plaintiff does not lack standing merely because her injury is an indirect product of the defendant's conduct."); *see also DeFalco v. Dechance*, 949 F. Supp. 2d 422, 429–30 (E.D.N.Y. 2013) (finding Article III standing where the plaintiffs "adequately alleged that but for the [zoning board of appeals's]

32

decision, they would have been able to develop the premises . . . so that they suffered a concrete injury"); *cf. Warth v. Seldin*, 422 U.S. 490, 507 (1975) (noting that, in cases where "the plaintiffs challenged zoning restrictions as applied to particular projects that would supply housing . . . of which they were intended residents," standing existed because "[t]he plaintiffs . . . were able to demonstrate that . . . their . . . personal interests would be harmed").[18]

Third, where Plaintiff seeks compensatory damages under § 1983 for economic injuries sustained as a result of these constitutional violations, an order from the Court awarding Plaintiff monetary relief will redress his injury. *See Davis v. Passman*, 442 U.S. 228, 248 (1979) ("By virtue of [§ 1983], a damages remedy is . . . available to redress injuries [resulting from unconstitutional actions] when they occur under color of state law."); *see also Maxineau v. City of New York*, No. 11-CV-2657, 2013 WL 3093912, at *11 (E.D.N.Y. Jun. 18, 2013) (finding that even nominal damages under § 1983 are "sufficient . . . redress for the purposes of Article III standing"); *cf. Official Comm. of Unsecured Creditors of WorldCom, Inc. v. S.E.C.*, 467 F.3d 73, 77 (2d Cir. 2006) (finding Article III standing where the plaintiff "suffered economic injuries" and "[sought] financial compensation to redress those losses").

Fourth, this holding is consistent with numerous cases holding that a party has standing to challenge an unconstitutionally applied zoning law even if the party is not the owner of the subject property. *See, e.g., Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 262 (1977) (finding Article III standing where the plaintiff was not the owner of the property subject to a rezoning-petition denial but had "expended thousands of dollars on the

---

[18] This Opinion's forthcoming discussion of proximate cause further supports the Court's holding with regard to the causation requirement. *See Rothstein v. UBS AG*, 708 F.3d 82, 92 (2d Cir. 2013) ("[T]he test for whether a complaint shows the 'fairly traceable' element of Article III standing imposes a standard lower than proximate cause.").

plans for [the property] and on the studies submitted to the [defendant village] in support of the petition for rezoning"—which studies and plans "[would] be worthless" "[u]nless rezoning [was] granted"); *Tsombanidis v. West Haven Fire Dep't*, 352 F.3d 565, 574 n.6 (2d Cir. 2004) (finding Article III standing where an organization would suffer injury from enforcement of a zoning ordinance against a third-party property owner); *Fair Housing in Huntington Comm. Inc. v. Town of Huntington, N.Y.*, 316 F.3d 357, 360, 363 (2d Cir. 2003) (finding Article III standing where the plaintiffs alleged that a town's discriminatory "facilitati[on] [of] [a] development" project owned by a third party caused an injury in fact through perpetuating and exacerbating segregation); *Anderson Grp., LLC v. City of Saratoga Springs*, No. 05-CV-1369, 2011 WL 2472996, at *2–3 (N.D.N.Y. June 21, 2011) (finding Article III standing where the plaintiff demonstrated "economic injuries . . . . fairly traceable to [the defendant city's] zoning policies and practices"—including "expend[ing] time, money, and effort in developing the plans for [the property], soliciting and receiving professional services, and preparing and submitting its proposals and applications to [the city]"—even though the defendant argued that the plaintiff "had an insufficient interest in, i.e., no legally enforceable rights relating to," the property at issue); *Lynn v. Vill. of Pomona*, 373 F. Supp. 2d 418, 427–28 (S.D.N.Y. 2005) (finding Article III standing where the plaintiffs "sufficiently alleged that they suffered economic losses and other hardships as a result of defendants' allegedly discriminatory application of the [zoning law], and [sought] to recover this loss," even though the defendant village allegedly applied the zoning law to deny COs to third-party property owners).

Finally, Defendants' sole argument that Plaintiff did not own the subject property when the constitutional violation occurred, and that Plaintiff therefore has no standing to seek damages, was squarely rejected by the Supreme Court in *Warth v. Seldin*, 422 U.S. 490 (1975).

In that case, the plaintiffs claimed that the defendants' "enforcement of [an] ordinance against

third parties—developers, builders, and the like—ha[d] had the consequence of precluding the

construction of housing suitable to their needs" and thereby injured them.  *Id.* at 504.  Endorsing

the plaintiffs' argument in part, the Court held that

> [t]he fact that the harm to [the plaintiffs] may have resulted indirectly does not in
> itself preclude standing.  When a governmental prohibition or restriction imposed
> on one party causes specific harm to a third party, harm that a constitutional
> provision or statute was intended to prevent, the indirectness of the injury does not
> necessarily deprive the person harmed of standing to vindicate his rights.

*Id.* at 504–05.  The Court ultimately found that the plaintiffs had no standing because "none of

[the plaintiffs] ha[d] a present interest in any [property subject to the ordinance]; none [was]

himself subject to the ordinances strictures; and none ha[d] even been denied a variance or

permit by respondent officials."  *Id.* at 504.  Here, however, Plaintiff, as "one of the owners of

Gladstone," (Defs.' Mem. 4), had an interest in the subject property even when Gladstone was

the property owner.  And Plaintiff himself, not Gladstone, applied for the CO that Defendants

unconstitutionally denied.  (*See* Defs.' Decl. Ex. Q, at unnumbered 15.)  Therefore, Plaintiff has

standing, and the Court has subject matter jurisdiction over Plaintiff's claims.

### 4.  Substantive Due Process

Defendants next argue that the Court should grant summary judgment on Plaintiff's

substantive-due-process claim.  As discussed, the district court originally granted summary

judgment for Defendants on Plaintiff's substantive-due-process claim, but the Second Circuit

vacated that judgment because "[t]he district court's rationale . . . turned on its denial of

[Plaintiff's] void-for-vagueness claim, which [the Second Circuit] reversed" in a different section

of its opinion.  *Cunney*, 660 F.3d at 626.  It thus "[left] it to [this Court] to decide in the first

instance the viability and merits of [Plaintiff's] substantive due process claim."  (*Id.*)

35

a.  Legal Standard

To prevail on this claim, Plaintiff "must show 1) that [he] had a valid property interest in the certificate of occupancy and 2) that the [Village] infringed that interest in an arbitrary or irrational manner."  *O'Mara v. Town of Wappinger*, 485 F.3d 693, 700 (2d Cir. 2007); *see also 49 WB, LLC v. Vill. of Haverstraw*, 511 F. App'x 33, 34 (2d Cir. 2013) (same).  Defendants argue that Plaintiff fails to meet both requirements.  However, because the Court agrees with Defendant that Plaintiff has failed to demonstrate a constitutionally protected property interest in the CO, it need not address Defendant's argument regarding the second requirement.  *See Clubside, Inc. v. Valentin*, 468 F.3d 144, 152 (2d Cir. 2006) ("Because we hold that [the plaintiff] lacks a valid property interest in the granting of the petition, we do not consider the second step of the analysis here."); *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 132 (2d Cir. 1998) ("[T]he threshold inquiry in a substantive due process analysis is whether the property interest claimed rises to the level of a property interest cognizable under the substantive Due Process Clause."); *HB v. Monroe Woodbury Cent. Sch. Dist.*, No. 11-CV-5881, 2012 WL 4477552, at *8 (S.D.N.Y. Sept. 27, 2012) (noting that if a plaintiff satisfies the "threshold requirement" of demonstrating a constitutionally protected property interest, "a court may then decide whether the deprivation of the protected interest is a violation of substantive due process").

"In order for an interest in a particular land-use benefit to qualify as a property interest for purposes of the substantive due process clause[,] a landowner must show a 'clear entitlement' to that benefit."  *O'Mara*, 485 F.3d at 700; *545 Halsey Lane Properties, LLC v. Town of Southampton*, — F. Supp. 2d —, 2014 WL 4100952, at *10 (E.D.N.Y. Aug. 19, 2014) (same); *see also Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995) ("An applicant

for a governmental permit has a protected property interest in the permit being sought only where the applicant has a clear entitlement to the approval sought from the government official or administrative body." (internal quotation marks omitted)).  Such an entitlement "exists where, under applicable state law, absent the alleged denial of due process, there is either a *certainty or a very strong likelihood* that the application would have been granted."  *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 504 (2d Cir. 2001) (emphasis added) (internal quotation marks omitted); *see also Ahmed v. Town of Oyster Bay*, — F. Supp. 2d —, 2014 WL 1092363, at *9 (E.D.N.Y. Mar. 18, 2014) (same).

The Second Circuit has recognized at least two circumstances in which a plaintiff will fail to meet the "certainty or very strong likelihood" test in the context of an application for a land-use benefit.  First, a protected property interest does not exist where a local authority has discretion to deny the application on non-arbitrary grounds.  *See RRI Realty Corp. v. Inc. Vill. of Southampton*, 870 F.2d 911, 918 (2d Cir. 1989) ("The fact that the permit could have been denied on non-arbitrary grounds defeats the federal due process claim."); *see also Watrous v. Town of Preston*, 902 F. Supp. 2d 243, 259–60 (D. Conn. 2012) (same); *Tomlins v. Vill. of Wappinger Falls Zoning Bd. of Appeals*, 812 F. Supp. 2d 357, 368 (S.D.N.Y. 2011) (same). Stated differently, "a constitutionally-protected property interest exists in a sought-after land-use permit or approval if the issuing agency lacked the authority to deny the permit or approval for a legitimate reason, or if the discretion of the issuing agency was so narrowly circumscribed that approval of a proper application was virtually assured."  *DLC Mgmt.*, 163 F.3d at 132; *Michael's Restaurant & Sports Bar, Inc. v. Vill. of Fishkill*, No. 13-CV-8392, 2014 WL 3887200, at *2 (S.D.N.Y. June 16, 2014) (same); *see also Clubside*, 468 F.3d at 154 (noting that the "certainty or very strong likelihood" standard is met "only where the issuing authority has virtually no

37

discretion to deny [an] application"); *Villager Pond*, 56 F.3d at 379 ("In order to establish a protected property interest in [the] permits, [the plaintiff] will have to establish a lack of discretion on the part of officials to deny their issuance."). Second, "[u]ncertainty as to the meaning of the applicable law [also] defeats a claim to a clear entitlement." *O'Mara*, 485 F.3d at 700; *see also Natale*, 170 F.3d at 263 ("Usually, entitlement turns on whether the issuing authority lacks discretion to deny the permit, *i.e.*, is required to issue it upon ascertainment that certain objectively ascertainable criteria have been met. There is no reason, however, to restrict the 'uncertainty' that will preclude existence of a federally protectable property interest to the uncertainty that inheres in an exercise of discretion. Uncertainty as to the meaning of applicable law also suffices."); *Reardon v. Keating*, 980 F. Supp. 2d 302, 328 (D. Conn. 2013) (same); *Allocco Recycling, Ltd. v. Doherty*, 378 F. Supp. 2d 348, 371 (S.D.N.Y. 2005) (same). Thus, taking both of these circumstances together, the Court's analysis of Plaintiff's property interest in the CO "turns on the degree to which state and local law *unambiguously limits* the [ZBA's] *discretion* to deny" Plaintiff's CO application. *Clubside*, 468 F.3d at 154 (emphasis added); *see also Natale*, 170 F.3d at 263 n.1 ("[I]n order to establish a federally protectable property interest in a state or local permit for which a plaintiff has applied, the plaintiff must show that . . . there was *no uncertainty* regarding his entitlement to it under applicable state or local law, and the issuing authority had *no discretion* to withhold it in his particular case." (emphasis added)).

Before applying the "certainty or very strong likelihood" test to Plaintiff's claim, two features of that test bear mention. First, in applying the test, the Court's inquiry focuses on the *objective* amount of ambiguity or discretion present in the context of the ZBA's consideration of Plaintiff's CO application. *See O'Mara*, 485 F.3d at 699–700 (certifying a "question of [state] law surrounding the enforceability of [a zoning regulation]" to the New York Court of Appeals,

and holding that "the uncertainty that [led the court to] certify [that question of law] [meant] that the [plaintiffs] did not have a 'clear entitlement' to a certificate occupancy"); *Natale*, 170 F.3d at 263–64 (holding that the plaintiff had no entitlement to building and zoning permits where the entitlement "turned ultimately on the resolution of [a] state law dispute," and where "[t]hat issue turned on the meaning of [a state statute] and an interpretation of [a] state court decision"); *RRI Realty*, 870 F.2d at 918 ("Application of the test must focus primarily on the degree of discretion enjoyed by the issuing authority, not the estimated probability that the authority will act favorably in a particular case. . . . Even if in a particular case, objective observers would estimate that the probability of issuance was extremely high, the opportunity of the local agency to deny issuance suffices to defeat the existence of a federally protected property interest.").  For this reason, "[i]n almost all cases, the existence of a federally protectable property right is an issue of law for the court."  *Natale*, 170 F.3d at 263; *St. Francis Hosp. v. Sebelius*, — F. Supp. 2d —, 2014 WL 3715117, at *9 (E.D.N.Y. July 23, 2014) (same); *see also DLC Mgmt.*, 163 F.3d at 132 ("Because the focus of this inquiry is on the degree of the issuing agency's official discretion and not on the probability of its favorable exercise, the question of whether an applicant had a protectable property interest is normally a matter of law for the court.").

Second, when making this objective determination, the Court focuses on the amount of ambiguity or discretion present *at the time Plaintiff's CO application was denied*.  *See Natale*, 170 F.3d at 263 n.1 ("[T]he plaintiff must show that, *at the time the permit was denied*, there was no uncertainty regarding his entitlement to it under applicable state or local law, and the issuing authority had no discretion to withhold it in his particular case." (emphasis added)); *see also Villager Pond*, 56 F.3d at 379 (directing the district court to determine whether, "*prior to the issuance of the zoning permits*, the discretion to issue them was so limited that a property interest

39

existed in the[] permits" (emphasis added)); *RRI Realty*, 870 F.2d at 919 (finding no protected

property interest where "a state court found the [local authority] to have exceeded its

jurisdiction" in denying a permit, but where, "[*p*]*rior* to the Article 78 proceeding, there was no

clear likelihood that the state court would deem issuance of [the permit] to be required").

Accordingly, a constitutionally protected property interest in a land-use benefit would not exist

where a local authority possessed sufficient discretion to deny the benefit even if the authority

was later found to have exercised that discretion unlawfully.  *See Clubside*, 468 F.3d at 157

("[A]n Article 78 court's . . . determin[ation] that [a town board's] ruling was arbitrary and

capricious and not supported by substantial evidence . . . is not equivalent to a finding that the

town board lacked discretion in the first instance."); *DLC Mgmt.*, 163 F.3d at 132 ("[A] plaintiff

may lack a protected property interest in a permit even when the permit was denied arbitrarily.").

And such an interest also would not exist even if a local authority exercised its discretion under a

law that was later determined to be invalid.  *See Dean Tarry Corp. v. Friedlander*, 826 F.2d 210,

213 (2d Cir. 1987) (finding that the plaintiff's "application was rejected pursuant to a zoning

ordinance, *extant at the time* [*the plaintiff*] *submitted its plan for approval*, that conferred broad

discretion on the Planning Board," holding that "this discretion, *embodied in the governing law*,

prevented [the plaintiff's] expectation of success from rising to the level of certainty required to

give rise to a cognizable property right," and noting that state court decisions "invalidating the

zoning ordinance . . . [did] not require a contrary result" because "[t]he Planning Board

possessed wide discretion under *then existing law*"); *Vertical Broad., Inc. v. Town of

Southampton*, 84 F. Supp. 2d 379, 393 (E.D.N.Y. 2000) ("The discretion granted the Town under

the ordinance, even if such discretion was unlawful, prevents plaintiffs from having an

40

expectation of being granted a zoning variance sufficient to rise to the level of a protected property interest.").

b.  Degree of Discretion

Turning to Plaintiff's claim, which alleges that the Village Building Inspector's denial of Plaintiff's CO application deprived Plaintiff of substantive due process, the Court first engages in an "assessment of the powers" of the Building Inspector at the time Plaintiff's CO was denied. *See RRI Realty*, 870 F.2d at 919.  As relevant here, the Village Zoning Law generally empowered the Building Inspector to

> [i]nspect any building, structure[,] or land to determine whether any violation of [the Village Zoning Law], the New York State Uniform Fire Prevention and Building Code, or such other laws, rules or regulations as the Building Inspector shall be chargeable with inspection or enforcement of, has been committed or exist, whether or not such building, structure or land is occupied.  The Building Inspector shall have authority to inspect and enforce all laws, rules and regulations relating to or affecting lots, buildings and/or structures, and their use and occupancy.

(Village Zoning Law, at XI.D.1(a).)  It also specifically empowered the Building Inspector to

> [i]ssue such permits and certificates in conformity with the laws, rules and regulations of the State of New York and of [the Village Zoning Law] and refuse to issue same in the event of non-compliance, which reason therefor shall be endorsed on the application and notice thereof given to the applicant, as provided in [the Village Zoning Law].

(*Id.* at XI.D.1(b).)

With regard to the Building Inspector's authority to issue a CO, the Village Zoning Law provided that,

> [b]efore issuing a [CO], the . . . Building Inspector . . . shall examine or cause to be examined all buildings, structures and sites for which an application for a Building Permit or Zoning Permit has been filed, and may conduct such inspections as are deemed appropriate from time to time during construction and after completion of work.

(*Id.* at XII.I.)  It further provided that,

41

> [w]hen, after final inspection, it is found that the proposed work has been completed in accordance with the applicable building codes, local laws, rules and regulations, and also in accordance with the application, plans and specifications filed in connection with the issuance of the Building Permit or Zoning Permit, the Building Inspector . . . shall issue a [CO].  If it is found that the proposed work has not been properly completed, a [CO] . . . shall not be issued and the work shall be ordered to be completed in conformity with the Building or Zoning Permit and in conformity with applicable law.

(*Id.* at XII.J.)  Under the Village Zoning Law, therefore, the Building Inspector had authority to "[i]ssue [a CO]" for a building that is found to be "in conformity with the laws, rules and regulations of the State of New York and of [the Village Zoning Law]," and to "refuse to issue [a CO] in the event of non-compliance."  (*Id.* at XI.D.1(b).)  In making this determination of "conformity" or "non-compliance," the Building Inspector was required to conduct a final inspection.  (*Id.* at XII.I (providing that the Building Inspector "shall examine or cause to be examined" the subject building).)  Moreover, upon finding compliance, the Building Inspector was required to issue a CO.  (*Id.* at XII.J (providing that "the Building Inspector . . . *shall* issue a [CO]" after finding compliance).)  Conversely, the Building Inspector was required to *deny* a CO upon finding non-compliance.  (*Id.* ("If it is found that the proposed work has not been properly completed, a [CO] . . . *shall not* be issued . . . .").)  In this way, the Village Zoning Law appears to have significantly limited the Building Inspector's discretion once he made a determination of compliance or non-compliance, and it did so in a way that might support a protected property interest.  *See Walz v. Town of Smithtown*, 46 F.3d 162, 168 (2d Cir. 1995) (finding "circumscribed . . . discretion" that established a protected property interest where the local law specified that, "[u]pon compliance with [the local law's] requirements, a permit *shall* be issued," and where the local law required only that the applicant provide certain information in the application (emphasis added)); *Sullivan v. Town of Salem*, 805 F.2d 81, 85 (2d Cir. 1986) (finding a possible protected property interest where the plaintiff alleged "that his houses fully

conformed to all [applicable] requirements" and where the local law provided that "[i]f the houses complied with [those] requirements, there was no element of discretion or judgment remaining for the building official to exercise in determining whether to issue the certificates").

But this is not a case, as in *Walz* and *Sullivan*, "where local officials were *required* by law to grant [a] permit if the application was properly filed." *Harlen Assocs.*, 273 F.3d at 504 (emphasis added) (citing *Walz*, 46 F.3d at 168; *Sullivan*, 805 F.2d at 85). Here, the Village Zoning Law gives the Building Inspector discretion to make a determination of conformity or non-conformity. That determination, in turn, must be supported by two sub-determinations: first, "that the proposed work ha[d] been completed in accordance with the applicable building codes, local laws, [and] rules and regulations," and, second, "that the proposed work ha[d] been completed . . . in accordance with the application, plans and specifications filed in connection with the issuance of the Building Permit or Zoning Permit." (Village Zoning Law, at XII.J.1; *see also* Defs.' 56.1 Statement ¶¶ 64, 66 ("Mr. Knizeski exercises his discretion and determines whether to grant a [CO] based on whether there is compliance to the Zoning Code, Building Code, the construction documents and the plans that were submitted. . . . Mr. Knizeski's discretion is limited to determining whether the structure complies or does not comply and if the project complies he must issue the [CO].").)[19] The Village Zoning Law does not appear to have separately defined how the Building Inspector must make either of these determinations—and,

---

[19] Plaintiff nominally "disputes" these statements, but he appears to do so only on the ground that Knizeski "acted *ultra vires* in relinquishing his duties to others" and that a planning board chair "directed enforcement based upon his personal view of how [the local law] should be applied." (Pl.'s 56.1 Statement ¶¶ 64, 66.) Plaintiff's dispute over what actually happened *in this case*, however, does not create a genuine dispute over whether Knizeski, *in general*, had discretion to make a compliance determination. *See RRI Realty*, 870 F.2d at 918–19 (holding that the property-interest analysis "focuses on the degree of official discretion" and "an assessment of the powers" of the local authority).

specifically, whether he or she *must* find that a building was constructed "in accordance" with applicable laws or the site plans in any specific context.  Concededly, the discretion is not unlimited; a Building Inspector could not *arbitrarily* find non-compliance with any particular requirement.  *See Lucas v. Bd. of Appeals of Vill. of Mamaroneck*, 974 N.Y.S.2d 464, 468 (App. Div. 2013) (reviewing certificate-of-occupancy determination for arbitrary or capricious action); *see also B. & G. Constr. Corp. v. Bd. of Appeals of Vill. of Amityville*, 128 N.E.2d 423, 424 (N.Y. 1955) (upholding a denial of a certificate of occupancy because "that denial was not arbitrary but [was] based on sufficient proof of violation of a valid local zoning ordinance"); *Ten Two Ninety Realty Corp. v. Zoning Bd. of Appeals of Vill. of Harriman*, 633 N.Y.S.2d 370, 344 (App. Div. 1995) ("It is well settled that local zoning boards have broad discretion in considering applications for permits and variances, and that judicial review is limited to determining whether the action taken by the board is illegal, arbitrary, or an abuse of discretion.").  But within the limits of non-arbitrary action, the Building Inspector had authority to deny a CO upon finding that it was not "in accordance" with applicable laws or with the original plans.

In denying Plaintiff's application, the Building Inspector found that "the elevation of roof height exceed[ed] that as described in" the unconstitutionally vague height ordinance.  (*See* Defs. Decl. Ex. Q, at 16.)  The denial was therefore based only on a finding that the house was not "in accordance" with a local ordinance.  *See Cunney*, 660 F.3d at 626 ("The record is clear that the only reason provided by the Village for the denial of [Plaintiff's] CO application was that his house exceeded section E's height restriction.").  Plaintiff argues that this determination was arbitrary, and that Defendants therefore acted arbitrarily when they denied his CO application.

Second Circuit precedent squarely holds, however, that "[a] plaintiff may be deemed *not* to have a protected property interest . . . *even in* a case where the denial of the permit *is*

44

arbitrary"; "[t]he fact that the permit *could have been denied* on non-arbitrary grounds defeats the federal due process claim." *RRI Realty*, 870 F.2d at 918 (second and fourth emphasis added); *see also Clubside*, 468 F.3d at 158 (same); *Walz*, 46 F.3d at 168 (same); *see also Watrous*, 902 F. Supp. 2d at 259–60 (same); *Tomlins*, 812 F. Supp. 2d at 368 (same).  And here, the Building Inspector could have denied the CO application on the non-arbitrary ground that the house was not built "in accordance" with the site plan originally filed in connection with the Building Permit.  Undisputed parts of the record reflect that, in September 2007, Vernon requested that Collazuol obtain height measurements of the house at the same five locations used in the site plan.  (*See* Defs.' 56.1 Statement ¶ 68; Defs. Decl. Ex. V, at unnumbered 1 (Letter from Vernon to Collazuol (Sept. 13, 2007)).)  After completing the survey, Collazuol reported that the measurements at four of the stations were "somewhat consistent with the site plan," implying that these measurements were not *entirely* consistent with the site plan and that the measurement at one of the stations was *not consistent*.  (*See* Defs. Decl. Ex. U, at unnumbered 3 (Letter from Collazuol to Bley (Oct. 30, 2007).)  This conclusion was supported by the as-built survey Atzl conducted in September 2007, (*see* Defs.' 56.1 Statement ¶ 71), which concluded that the final house was taller than the proposed house:

Q. . . . .  [T]he final house was over height; correct?

A: Yes.

Q: And by how much?

A:  I believe it was 2.9 or 3 feet.

Q:  Mr. Collazuol testified that it was 2.95 feet; does that sound about right?

A:  Yes.

. . . .

Q: . . . .  Now, how did the other foot over height [, i.e.[,] the one-foot overage not attributable to the two-foot error in the road elevations,] come into being?

A:  It got to be in the framing for the roof, the floors or something.

. . . .

Q:  So, would it be fair to say that if your site plan had not had the incorrect 2 feet, mistake, the house would still have been a foot over height?

. . . .

A:  I believe so.

(Defs.' Decl. Ex. BB, at 50-51 (Atzl Dep).)  Furthermore, it was consistent with the "grade

sheet" Collazuol submitted to Knizeski as part of his final survey of the property, which grade

sheet indicated that the as-built measurements differed at all five of the site-plan stations, two of

which exceeded the planned heights by between 0.51 and 0.95 inches (after controlling for the

two-foot road-elevation error).  (*See* Defs.' Decl. Ex. U, at unnumbered 5.)  Therefore,

exercising his discretion to interpret the Village Zoning Law to require strict compliance, the

Building Inspector could have denied the CO on the non-arbitrary ground that the house was not

built "in accordance" with the site plan.  *See Christian v. Town of Riga*, 649 F. Supp. 2d 84, 98

(W.D.N.Y. 2009) (finding no property interest in a prospective building permit where the town's

building inspector "had the discretion to determine whether an application conforms with the"

town code)

Plaintiff would argue that the difference between the as-built house and the site plan was

minor, and that the Building Inspector would not have denied the CO application on that ground.

Indeed, in his initial report of the results of the site-measurement survey, Collazuol "[found] that

the building and roofs ha[d] been constructed substantially in accordance with the plans

submitted by the Architect in that the building [was] no greater in height than that as proposed,"

noting that "[t]he diminimous [sic] difference in roof height should be neglected as [it fell]

46

within typical building tolerances, ie. [sic] 0.90 ft. or 10 inches." (Defs. Decl. Ex. U, at

unnumbered 3 (Letter from Collazuol to Bley (Oct. 30, 2007)).)  The fact remains, however, that

Knizeski was not *required* to adopt Collazuol's recommendation and find that the difference

between the site plan and the as-built house was de minimis or that the house complied with the

plan despite the difference.  Absent a provision of local or state law limiting the Building

Inspector's discretion in the face of even slight non-compliance—for example, a provision that

mandates a finding of compliance where the height of a final structure exceeds a site plan by less

than one foot, or by less than 10 percent—Knizeski had the authority to deny Plaintiff's CO

application on the grounds that the house was not built "in accordance with the application,

plans[,] and specifications filed in connection with the issuance of the Building Permit."

(Village Zoning Law, at XII.J.1.)  This "degree of discretion" accorded to the Building Inspector

is sufficient to defeat Plaintiff's property interest in the CO, even if it was "extremely" likely that

Knizeski actually would have found that Plaintiff's house was built "in accordance" with the site

plan.  *See RRI Realty*, 870 F.2d at 918 ("Even if in a particular case, objective observers would

estimate that the probability of issuance was *extremely high*, the *opportunity* of the local agency

to deny issuance suffices to defeat the existence of a federally protected property interest. . . .

[A]n entitlement does not arise simply because it is *likely* that broad discretion will be favorably

exercised." (emphasis added)); *see also Clubside*, 468 F.3d at 153 (same); *545 Halsey Lane*

*Properties*, 2014 WL 4100952, at *11 (same); *cf. RRI Realty*, 870 F.2d at 919 (finding no

protected property interest in a permit where, although not mentioned by the local authority in

refusing to grant the permit, "it [was] undisputed that the structure violated the height limit in [a]

zoning variance that had been granted at the outset of construction," but there "was surely not a

certainty nor a clear likelihood that state law would later be construed to require issuance of a permit notwithstanding the zoning noncompliance").[20]

Moreover, in the context of the undisputed record demonstrating that the house was not built *strictly* "in accordance" with the site plan, the Building Inspector arguably lacked discretion to *grant* the CO.  (*See* Village Zoning Law, at XII.J ("If it is found that the proposed work has not been properly completed, a [CO] . . . *shall not be issued* . . . .").)  Indeed, the Village Zoning Law appears to support this interpretation, as it grants the ZBA power to hear "appeal[s] from . . . order[s], requirement[s], decision[s] or determination[s] made by the Building Inspector," and discretion to grant variances from "the *strict letter* of [the] local law."  (*Id.* at XIII.D.3.) And, in exercising this power, the ZBA enjoys the type of wide discretion that has thwarted claims of property interests in other cases.  (*See id.* at XIII.D.3(a) (requiring the ZBA to consider, inter alia, any potential "detriment to the health, safety[,] and welfare of the neighborhood or community," "whether an undesirable change will be produced in the character of the neighborhood or a detriment to nearby properties will be created," "whether the variance

---

[20] The Court's conclusion is consistent with the Second Circuit's opinion in this case. First, the Court's description of Collazuol's findings in the as-built survey matches the Second Circuit's description of those findings.  *See Cunney*, 660 F.3d at 617–18.  Second, although the Second Circuit appeared to suggest that Plaintiff's house "complied with section E" under certain interpretations of the ordinance, *see id.* at 622 (characterizing Collazuol's July 2007 and October 2007 letters as concluding that the house complied with section E), nowhere did it find that Plaintiff's house was built "in accordance" with *the site plan*.  Third, although the court stated that "[t]here is no question . . . that a reasonable enforcement officer . . . would . . . find a three inch overage to be *de minimis*," it did so only in the context of its holding that Plaintiff's "house *could* be considered to be in compliance with section E" under a reasonable interpretation of the ordinance.  *Id.* at 625.  But this is different from holding that an enforcement officer would be *required* to adopt that interpretation (and that the officer would be required to do so in the context of a site-plan-compliance determination, rather than an ordinance-compliance determination).  If anything, the court's recognition that an enforcement officer "could" find compliance despite a de minimis variation supports this Court's finding that Knizeski had discretion not to find such compliance.

48

requested is substantial," and "whether the variance will have an adverse effect or impact on the physical or environmental conditions in the neighborhood").)  *See Clubside*, 468 F.3d at 157 (holding that "the statutory authority to consider whether [an application] [was] in the public interest vest[ed] the [local authority] with sufficient discretion to defeat [the plaintiff's] claim to a constitutionally protectable property interest"); *Crowley v. Courville*, 76 F.3d 47, 52 (2d Cir. 1996) (finding "extremely broad discretion" where the zoning law provided "guiding principles" and "general standards" for considering variance applications) (alterations and internal quotation marks omitted); *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 192–93 & nn.1–3 (2d Cir. 1994) (finding "broad discretion" where the local law required that authorities consider "the public interest," "the public health, safety[,] and general welfare, the impact of the proposed use on adjacent land uses, [and] the comfort and convenience of the public in general and of the residents of the immediate neighborhood in particular"); *RRI Realty*, 870 F.2d at 919 (finding "wide discretion" where the local authority was "charged with the duty of exercising sound judgment and of rejecting plans which, in its opinion, [were] not of harmonious character because of proposed style, materials, mass, line, [and] color" (internal quotation marks omitted)); *Yale Auto Parts, Inc. v. Johnson*, 758 F.2d 54, 59 (2d Cir. 1985) (finding wide discretion and no property interest where the local authority was "required to take into account the nature and development of surrounding property; the proximity of churches, schools, hospitals, public buildings[,] or other places of public gathering; . . . [and] the health, safety[,] and general welfare of the public" (internal quotation marks omitted)); *see also Margaritis v. Zoning Bd. of Appeals*, 821 N.Y.S.2d 611, 613 (App. Div. 2006) ("Local zoning boards have broad discretion in considering applications for area variances.").  Thus, under either interpretation of the Village Zoning Law—one giving the Building Inspector discretion to determine conformity, the other

49

giving the ZBA discretion to grant a variance in the face of strict non-conformity—Plaintiff's

claim fails because of the degree of discretion that could have been applied to his application.

c.  Legal Uncertainty

Alternatively, even absent discretion to deny Plaintiff's application on a non-arbitrary

ground, the Court would still hold that Plaintiff had no protected property interest in light of the

undisputed fact that the ordinance was vague.  As discussed, the Second Circuit has consistently

held that "[u]ncertainty as to the meaning of the applicable law defeats a claim to a clear

entitlement."  *O'Mara*, 485 F.3d at 700; *see also Clubside*, 468 F.3d at 153 (same); *Natale*, 170

F.3d at 263 (same); *cf. Town of Castle Rock, Colo. v. Gonzalez*, 545 U.S. 748, 763–64 (2005)

("[I]ndeterminacy is not the hallmark of a duty that is mandatory.  Nor can someone be safely

deemed 'entitled' to something when the identity of the alleged entitlement is vague." (citing

*Natale*, 170 F.3d at 263)).  Here, there is no dispute—and, indeed, the Court is constrained to

hold—that Plaintiff was "[u]ncertain[] as to the meaning" of section E when he applied for the

CO.  As the Second Circuit held in this case, section E "is *remarkably unclear* with respect to

how the four and a half foot limitation is defined. . . .  Consequently, this shortcoming . . .

fail[ed] to give specific notice of how a permit applicant should design his site plan so that the

proposed building complies with that restriction."  *Cunney*, 660 F.3d at 621 (emphasis added).

Furthermore, the Second Circuit held that "the ordinance provides no standard that can be

objectively applied to determine if the conduct at issue in this case . . . complies with the

ordinance's restrictions."  *Id.* at 622.  In the context of these holdings, Plaintiff cannot

demonstrate a "certainty or very strong likelihood" that he would have obtained a CO, because

the very nature of his vagueness claim is that he did not understand how to comply with the law.

Thus, the "question of law" presented by the ambiguity in the ordinance defeats Plaintiff's clear-

50

entitlement claim.  *See O'Mara*, 485 F.3d at 700 (holding that a "question of law" unresolved at

the time the plaintiffs' CO application was denied introduced "uncertainty" sufficient to defeat a

"'clear entitlement' to a certificate of occupancy"); *Natale*, 170 F.3d at 263–64 (holding that the

plaintiffs had no clear entitlement to permits under state law where the fate of the permits

"turned ultimately on the resolution of [a] state law dispute as to . . . . the meaning of [a state

statute] and an interpretation of [a] state court decision"); *see also Laidlaw Energy & Envtl., Inc.

v. Town of Ellicottville, N.Y.*, No. 08-CV-32, 2011 WL 4954881, at *4–5 & n.3 (W.D.N.Y. Oct.

18, 2011) (noting, in the context of a plaintiff's claim that a zoning ordinance was "vague and

ambiguous," that the "claimed property interest could . . . be defeated because of uncertainty in

the underlying meaning of the relevant zoning codes").[21]

     Although the Second Circuit's conclusion about section E's vagueness is sufficient, by

itself, to support the Court's determination that Plaintiff had no property interest in the CO, a

brief discussion of the facts of this case makes it clear that there is no dispute that Plaintiff was

not clearly entitled to a CO.  At the April 2006 ZBA meeting, Atzl, on Plaintiff's behalf, raised

the issue of section E's ambiguity, resulting in an "apparent consensus that section E was vague

and required clarification," but not in an actual clarification.  *Cunney*, 660 F.3d at 616.  In fact,

although "the ZBA declined to interpret it," "three of the five members of the ZBA . . . offered

. . . their own interpretations."  *Id.*  Accordingly, as the Second Circuit put it, Plaintiff "was

forced back to the drawing board to revise his site plan and *to speculate how the ZBA would, in a*

---

[21] To make essentially the same point in a different way, one could also argue that section
E granted the Building Inspector discretion to decide how to measure a house's height and
thereby determine compliance, and that this discretion defeated the property interest.  *See
Cunney*, 660 F.3d at 625 (holding that section E gave Knizeski "*unfettered latitude* in making
compliance determinations" (emphasis added)).  Under either formulation, the takeaway is that
Plaintiff's entitlement to the CO was not clear in light of the vague law.

*future proceeding, enforce the height restriction against him.*"  *Id.* at 616–17 (emphasis added).

(*See also* Pl.'s 56.1 Statement ¶¶ 28–30 (arguing that "[the] law of [the] case provides that there

was 'lingering confusion stemming from the [April 4, 2006] ZBA hearings.'" (third alteration in

original) (quoting *Cunney*, 660 F.3d at 617)); Defs.' Decl. Ex. EE, at 62 (Cunney Dep.) ("Q: . . .

[A]s of April 2006, would it be fair to say that you understood that height issue was something

that needed to be considered in building this structure on the property? . . . .  [A:]  Yeah.").)

Plaintiff's successful site-plan and building-permit applications did not cure the uncertainty,

because there is no evidence in the record that those applications were approved pursuant to a

particular interpretation of section E.[22]  Finally, even in the letter denying Plaintiff's CO

application, Knizeski appeared to rely on multiple interpretations of section E, indicating that the

issue was unresolved at the time of denial.  (*See* Defs.' Decl. Ex. Q, at unnumbered 16 (Letter

from Knizeski to Plaintiff, indicating that the CO "must be denied based on" Collazuol's report

which "confirm[ed] that the elevation of roof height exceeds that as described in [section E].");

Defs. Decl. Ex. U, at unnumbered 5 (Letter from Collazuol to Knizeski, explaining that "[t]he as-

built difference" at one of the five stations was "the maximum difference of all the locations"

and was "2.95 ft. . . . greater than allowed," and that the elevation at that station was "0.25 ft

greater than the allowable when measured from the edge of River Road along the south property

---

[22] A few months after issuing the Building Permit, Knizeski did request "a letter from
[Plaintiff's] engineer . . . certify[ing] that the height of [the] new house [did] not exceed that as
stated in [section E]."  (Defs.' Decl. Ex. S.)  However, the request did not contain an
interpretation of section E or any instruction regarding the preferred measurement method.  (*See
id.*)  Atzl thereafter complied with the request, certifying that "[t]he elevations taken [were] in
conformance with the approved site Plan" and that, per section E, "[t]he elevation of the highest
part of the roof line will not be more than 4 1/2 feet of the easterly side of River Road."  (Defs.'
Decl. Ex. T.)  However, the record does not indicate that Knizeski, nor anyone acting on the
Village's behalf, formally endorsed Atzl's characterization of section E.  Moreover, Atzl's
interpretation did not even resolve the ambiguity, because it did not specify at which point on
River Road he measured.  (*See id.*)

line projected").)  Thus, it is undisputed that Plaintiff understood that section E was vague as applied to his house but nevertheless proceeded with construction.  And it is undisputed that this uncertainty lingered throughout the construction process, up to and including when Plaintiff's CO application was denied.  Arguably, therefore, far from establishing a clear entitlement to the CO in the face of the known ambiguity in section E, Plaintiff could not even establish a "unilateral expectation" that he met that section's concededly vague requirement.  *Cf. Town of Castle Rock*, 545 U.S. at 756 ("To have a property interest in a benefit, a person clearly must have . . . more than a unilateral expectation of it." (internal quotation marks omitted)); *Looney v. Black*, 702 F.3d 701, 706 (2d Cir. 2012) ("A 'unilateral expectation' is not sufficient to establish a constitutionally protected property right.")).

Even though the Court's holding is based on section E's vagueness, the fact that this vagueness was later found to rise to the level of a constitutional violation does not change the outcome.  First, to demonstrate a property interest, Plaintiff must show a "certainty or very strong likelihood" at the time of the denial.  *See Natale*, 170 F.3d at 263 n.1 ("[T]he plaintiff must show that, *at the time the permit was denied*, there was no uncertainty regarding his entitlement to it under applicable state or local law . . . ." (emphasis added)).  A court's subsequent order granting Plaintiff's request does not satisfy this requirement.  *See O'Mara*, 485 F.3d at 700 (holding that an unresolved question of law defeated the plaintiffs' property interest in a CO "[e]ven if the [state court] were to" later resolve the question in the plaintiffs' favor); *Clubside*, 468 F.3d at 157 ("[A]n Article 78 court's order directing a town board to take particular action when the court has determined that the board's ruling was arbitrary and capricious . . . is not equivalent to a finding that the town board lacked discretion in the first instance."); *RRI Realty*, 870 F.2d at 919 (dismissing a plaintiff's argument that a state court

"found the [local authority] to have exceeded its jurisdiction and ordered issuance of the . . . permit" because, "[p]rior to [that decision], there was no clear likelihood that the state court would deem issuance of [the permit] to be required").

Second, because the analysis focuses on Plaintiff's entitlement at the time of denial, it is irrelevant that the uncertainty-generating law was later invalidated.  In *Dean Tarry Corp. v. Friedlander*, 826 F.2d 210 (2d Cir. 1987), a local planning board rejected the plaintiff's site-development-plan application in an exercise of its discretion under a statute allowing it to consider the "health, safety and welfare of the people in the area."  *Id.* at 211 (internal quotation marks omitted).  Subsequently, a state court judge invalidated the denial and ordered the board to approve the plaintiff's plan, basing its decision in part on a determination "that the discretion given to the Planning Board by the zoning ordinance was beyond the scope of the enabling statute."  *Id.*  In rejecting the plaintiff's substantive-due-process claim based on the planning board's denial of his application, the Second Circuit explained that the board's "discretion, embodied in the *governing law*, prevented [the plaintiff's] expectation of success from rising to the level of certainty required to give rise to a cognizable property right."  *Id.* at 213 (emphasis added)).  And although the state court had ultimately invalidated the zoning ordinance because it unlawfully granted the planning board too much discretion, the invalidation "[did] not require a contrary result" in the case because the court applied the clear-entitlement analysis in the context of the law existing at the time of the denial.  *See id.* ("The Planning Board possessed wide discretion under *then existing law* to reject [the plaintiff's] site plan . . . .  This wide discretion prevented [the plaintiff's] expectation of success from rising to the level of a property right meriting protection under the . . . Fourteenth Amendment[]." (emphasis added)).  Similarly, here the Second Circuit ultimately invalidated section E because it "provided the Village enforcement

54

officers with unfettered latitude in making compliance determinations regarding [Plaintiff's] property." *Cunney*, 660 F.3d at 625.  Like the plaintiff in *Dean Tarry*, Plaintiff has won his claim that section E is invalid for granting too much discretion.  However, because the "unfettered latitude" was "embodied in the governing law" at the time Plaintiff applied for the CO, Plaintiff, also like the plaintiff in *Dean Tarry*, cannot demonstrate a clear entitlement to the CO.

Here, as discussed, Plaintiff's void-for-vagueness claim alleges a due process right entirely separate from his substantive-due-process claim, the latter of which focuses on Defendants' actions associated with their denial of the CO.  The relevant question, therefore, is whether, absent *those actions*—i.e., absent their *use* of section E—there was "a certainty or a very strong likelihood that the application would have been granted."  *Clubside*, 468 F.3d at 152. In the context of the vague ordinance, the Court concludes that there was no such certainty, because Plaintiff, by his own admission, was so uncertain as to the meaning of section E that he could not have known whether he complied with that section, *regardless* of whether Defendants ultimately used section E as a basis to deny the application.  In other words, "absent [Defendants'] alleged denial of [Plaintiff's] due process" when they *used* section E as a basis to deny his application, there was "[n]either a certainty [n]or a very strong likelihood that the application would have been granted" because there was sufficient "uncertainty as to the meaning of applicable law."  *Id.* at 152–53 (alterations omitted).

### d.  Vested Right

Plaintiff's argument that he had a "vested right" to the CO based on investments he undertook in reliance on his belief that he would obtain a CO does not save his claim.  (*See* Pl.'s Mem. 17–20.)  Specifically, Plaintiff argues that he "effected substantial change and incurred

substantial expense pursuant to a legally issued building permit," and that "[t]his gave rise to a

vested right to the CO upon the completion of construction, [because] implicit in issuing the

building permit was that the CO would be granted if the house was constructed in accordance

with those plans." (*Id.* at 20.)  However, none of the cases Plaintiff cites sufficiently supports the

proposition that Plaintiff acquired a vested right in an *unissued* CO because of expenditures he

undertook in connection with an *existing* building permit.  Indeed, most of the relevant cases he

cites stand for the related but different proposition that an individual may acquire a vested right

in an *existing* benefit after undertaking expenditures in reliance on *maintaining* that benefit.  *See*

*DLC Mgmt.*, 163 F.3d at 130 (vested-rights claim based on "existing zoning status"); *Frooks v.*

*Town of Cortlandt*, 997 F. Supp. 438, 450 (S.D.N.Y. 1998) (vested-rights claim where certificate

of occupancy "was wrongfully revoked"), *aff'd*, 182 F.3d 899 (2d Cir. 1999); *Town of*

*Orangetown v. Magee*, 665 N.E.2d 1061, 1064 (N.Y. 1996) (vested-rights claim seeking

"reinstatement of [a] building permit"); *Lombardi v. Habicht*, 740 N.Y.S.2d 101, 102–03 (App.

Div. 2002) (vested-rights claim based on revoked building permit); *Ranieri v. Argust*, 679

N.Y.S.2d 765, 766 (App. Div. 1998) (vested-rights claim based on existing certificate of

occupancy and building permit).

        Plaintiff does cite one case, *Acorn Ponds at North Hills v. Inc. Village of North Hills*, 623

F. Supp. 688 (E.D.N.Y. 1985), where a court found that a plaintiff had a property interest in an

unissued CO based on the plaintiff's completion of buildings in accordance with existing

building permits.  *See id.* at 692 ("[The plaintiff] claims that it had received 41 building permits

and that some of its buildings were completed . . . all in accordance with the building permits

issued by [the defendant].  It, therefore, had more than a unilateral expectation that [COs] would

be issued.  It had every reason to rely on the representation implicit in issuing the building

56

permits that [COs] would be granted if the buildings were constructed in accordance with the plans upon which the building permits were issued.").  However, *Acorn Ponds* pre-dates nearly every Second Circuit case the Court has cited in this analysis, none of those cases adopted its reasoning, and at least one of the cases implicitly conflicts with the reasoning.  *See O'Mara*, 696 F.3d at 696, 700 (finding no property interest in a CO where the plaintiffs began construction in reliance on a building permit and a temporary CO).  Moreover, the case is distinguishable because, as the Court has already discussed, here the Building Inspector could have found that Plaintiff's house did not comply with the site plan, and thus his interest would not have vested even under the reasoning applied in *Acorn Ponds*, where it was assumed that "the buildings were constructed in accordance with the plans upon which the building permits were issued."  623 F. Supp. at 692.  The Court therefore rejects Plaintiff's argument that he had a vested property right in the CO.

Thus, in light of the foregoing, and in accordance with the Second Circuit's order, the Court holds that Plaintiff has not demonstrated a constitutionally protected property interest in the CO.  Accordingly, the Court grants summary judgment for Defendants on this claim.

### 5.  Damages

Defendants finally seek to limit Plaintiff's ability to recover damages from his void-for-vagueness claim, arguing that he has failed to establish proximate cause for certain types of damages, and that they are entitled to a set-off from any damages ultimately awarded to Plaintiff in light of Plaintiff's settlement with Atzl Defendants.

Most of Defendants' proximate-cause arguments challenge Plaintiff's ability to recover damages from the denial of the CO application.  For example, Defendants argue that Plaintiff could have obtained the variance by moving or demolishing the pool house, (*see* Defs.' Mem.

57

13), that the denial of the CO did not prevent a sale of the property, (*see id.* at 14–15), and that Atzl's two-foot measurement error and a construction error were superseding and intervening causes that broke the causation chain between the vague ordinance and the denial of the CO, (*see id.* at 15–16).  Defendants also argue, in passing, that "[t]he fact that [Plaintiff] did not own the subject property defeats a proximate cause argument because the economic damages sustained by [Gladstone] are not recoverable by [Plaintiff]."  (*Id.* at 11.)

At the December 2012 hearing on the damages issue, the Court held that Plaintiff "may be awarded damages solely on his prevailing on the void for vagueness claim."  (Defs.' Decl. Ex. H, at 20–21.)  However, it did not "ma[k]e any particular finding as to what could be qualified or what could constitute such damages and whether or not Plaintiff has made out a case that the damages he claims he suffered were the result of the vague statute itself or the vague ordinance." (*Id.*)  Instead, the Court held that Plaintiff would have to "prove actual injury that resulted from his due process violation as a result of the void for vagueness."  (*Id.*)  As the Court further explained, Plaintiff must "show damages that were directly caused by the due process violation as explained by the Second Circuit in the context of the void for vagueness doctrine.  In other words, that but for the due process violation, [Plaintiff] would not have suffered the claimed damages."  (*Id.*)

Building on the Court's holding at the December 2012 hearing, in this Opinion the Court has interpreted Plaintiff's void-for-vagueness claim to claim damages caused by Plaintiff's speculation as a result of the vague statute, whereas it has interpreted Plaintiff's substantive-due-process claim to claim damages caused by Defendants' actions that were perhaps authorized by the vague statute.  So construed, and in light of the Court's grant of summary judgment for

58

Defendants on Plaintiff's substantive-due-process claim, the Court holds that Plaintiff may not recover damages caused by the denial of the CO application.

Notably, Plaintiff appears to ground his proximate-cause argument in "the Second Circuit's determination that 'the [r]ecord is clear that the only reason provided by the Village for the denial of [Plaintiff's] CO application was that his house exceed[ed] [s]ection E's height restriction.'" (Pl.'s Mem. 8–9 (quoting *Cunney*, 660 F.3d at 626).) This language from the Second Circuit's opinion, however, appeared in the section addressing Plaintiff's (now-dismissed) substantive-due-process claim. It is thus no support for Plaintiff's claim of damages resulting from the vagueness itself.

The Court therefore need not address Defendants' specific arguments related to the lack of proximate cause for the CO application denial. However, consistent with its holding in the December 2012 hearing, the Court declines to grant summary judgment to Defendants in full on the damages issue. None of Defendants' arguments in this Motion challenges the Court's previous determination that Plaintiff may be able to prove damages caused by the vagueness itself. Although the Court will once again decline to make a finding as to the specific types of damages Plaintiff may recover, it notes, by way of example, that such damages might include any unnecessary costs Plaintiff incurred while attempting to comply with the vague ordinance, any loss in property value Plaintiff suffered as a result of his understanding of the ordinance's requirement, as well as any actual injuries Plaintiff suffered from mental or emotional distress caused by his speculation, to the extent such damages are cognizable in the context of this case.[23] Moreover, although the Court agrees with Defendants that Plaintiff may not recover damages on

---

[23] To be clear, these examples are neither determinative nor exhaustive, and the Parties therefore should not rely on this statement either to claim entitlement to certain types of damages or to argue that Plaintiff is not entitled to unmentioned types of damages.

behalf of Gladstone, it also notes that Plaintiff may recover damages that he personally suffered despite Gladstone's ownership of the property at the time.

   With regard to Defendants' argument that they are entitled to a set-off of any damages Plaintiff recovers from the $175,000 settlement Plaintiff obtained from Atzl Defendants, the Court holds that they are not so entitled in the context of its holding of the types of damages Plaintiff may recover.  Initially, there is a dispute as to whether Defendants, in general, are entitled to a set-off in the context of a § 1983 claim.  (*Compare* Defs.' Mem. 18 (arguing that "a set-off is appropriate in a § 1983 case" (citing *Ruhlman v. Smith*, 323 F. Supp. 2d 356, 369 (N.D.N.Y. 2004) (applying a set-off in a § 1983 action); *Mason v. City of New York*, 949 F. Supp. 1068, 1079 (S.D.N.Y. 1996) (holding, "[i]n the[] circumstances [of that case]," that a set-off "would not conflict with . . . the policies underlying [§ 1983]," and applying the set-off)), *with* Pl.'s Mem. 14 ("[Section] 1983 does not provide for a setoff . . . ." (citing *Banks ex rel. Banks v. Yokemick*, 177 F. Supp. 2d 239, 263 (S.D.N.Y. 2001) (holding that a set-off in "the circumstances [presented in] [that] case [was] inconsistent with the policies § 1983 was intended to promote, and that [the defendant] [was] not entitled to [a] full setoff")).)  The Court need not resolve this dispute, however, because even if the Court could apply a set-off in the context of a § 1983 claim, Defendants concede that a set-off is appropriate only where the damages flow from the "same injury."  (*See* Defs.' Mem. 18 ("For setoff to apply. . . 'all that is required is that tortfeasors be subject to liability for damages for the same injury.'" (alterations omitted) (quoting *Mason*, 949 F. Supp. at 1076)).)  Here, the injury caused by the vagueness (Plaintiff's speculation) is not the same as the injury caused by Atzl Defendants ("negligen[ce] in the performance of surveying the Premises for Plaintiff," (*see* Compl. ¶ 38)).  Defendants appear to admit as much, in that they narrowly apply their set-off request to damages relating to the denial

of the CO. (*See* Defs.' Mem. 19 ("In this case, *to the extent that* [Plaintiff] seeks recovery for damages related to his alleged inability to sell the property, for carrying costs attributable to the property and any emotional distress caused by the denial of a [CO], he is seeking the same damages from both defendants and a set-off . . . is appropriate.").)  The Court therefore denies, without prejudice, Defendants' request for a set-off from the damages to which the Court has found Plaintiff is entitled.

### III.  CONCLUSION

To summarize, in light of the foregoing, the Court grants Defendants' Motion in part and denies it in part.  Specifically, it grants Defendants' Motion for summary judgment on Plaintiff's substantive-due-process claim, and it grants Defendants' Motion to dismiss Plaintiff's claims against Knizeski and the ZBA.  But the Court denies Defendants' Motion to dismiss Plaintiff's claims for lack of standing, and it denies Defendants' Motion for summary judgment on the damages and set-off issues given the Court's holding that Plaintiff is entitled to a specific type of damages in the context of his void-for-vagueness claim.  Moreover, in light of the Second Circuit's opinion remanding the case to this Court, the Court grants summary judgment in favor of Plaintiff on his void-for-vagueness claim.  The Clerk of Court is respectfully directed to terminate the pending Motion.  (*See* Dkt. No. 56.)

SO ORDERED.

Dated:        September 29, 2014
              White Plains, New York

                                          KENNETH M. KARAS
                                          UNITED STATES DISTRICT JUDGE

61